Arthur Avazian
AVAZIAN & AVAZIAN
California Bar Number: 41250
800 WILSHIRE BOULEVARD, SUITE 1500
LOS ANGELES, CALIFORNIA 90017-2619
TELEPHONE (213) 624-1793
FACSIMILE (213) 891-2890
E-MAIL: AAVAZIAN@AVAZIANLAW.COM

Attorney for Petitioner/Defendant ARASH AZIZ-GOLSHANI

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NUMBER: CR 00-07-GAF |
| Plaintiff, | DEFENDANT'S PETITION FOR WRIT OF CORAM NOBIS; MOTION TO VACATE AND AMEND JUDGMENT AND SENTENCE (ALL WRITS ACT 28 U.S.C. Sec. 1651 (a)) |
| v. | |
| ARASH AZIZ-GOLSHANI, | |
| Petitioner/Defendant. | |
| | DATE: |
| | TIME: |
| | JUDGE: |
| | HON. GARY ALLEN FEESS |

TO: THE HONORABLE GARY ALLEN FEESS, UNITED STATES DISTRICT
COURT JUDGE; OFFICE OF THE UNITED STATES ATTORNEY, CENTRAL
DISTRICT:

Defendant, Arash Aziz-Golshani, by and through his counsel,
Arthur Avazian, respectfully submits this Petition for Writ of
Corum Nobis to challenge the validity of his conviction, and in
particular his plea of guilty on March 15, 2000 and his
subsequent sentencing on January 22, 2001. The factual and legal

1

grounds for said petition are set forth hereafter in the Memorandum of Points and Authorities.   Defendant also seeks to vacate the conviction under the All Writs Act, 28 U.S.C. Sec. 1651(a).

August 4, 2011                                        _____/S/_____

                                                ARTHUR AVAZIAN
                                                Attorney for Defendant
                                                ARASH AZIZ-GOLSHANI

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On March 15, 2000, before this Honorable Court, Defendant, ARASH AZIZ-GOLSHANI ("Arash"), entered a plea of guilty to securities fraud in violation of 15 U.S.C 78. It is Defendant's contention in this Petition that he received ineffective assistance of counsel prior to and during the entry of his plea of guilty in this matter as well as the time of his sentencing on January 22, 2001.

Arash entered the United States in 1985 when he was nine years old, with his immediate family, all of whom live in the United States and are United States citizens. Arash was a permanent resident of the United States and had not yet achieved naturalization at the time of this conviction. After Arash served a 15 month prison sentence, he was detained by Immigration and charged with deportability based on this conviction, which is classified as an aggravated felony. Because of the current conditions in Iran (Arash's birthplace), the Immigration Judge granted withholding of removal. This relief does not allow Arash to maintain his permanent resident status and can be later revoked if conditions in Iran change. (Please refer to Exhibit 1, Declaration of David Ross, Arash's immigration attorney)

At the time of his plea, Arash had just graduated from U.C.L.A. with a Bachelors Degree in Anthropology. The facts of his violation of law consisted of buying with friends "penny stocks" and posting messages on the internet finance message

boards regaling the stocks. Upon the stocks increasing in value, Arash and his friends would then sell the stocks at a profit.

On March 15, 2000, Arash pled guilty to 18 U.S.C. 371 and 15 U.S.C. 78j and was sentenced on January 22, 2001 by Judge Feess, who imposed the sentence of 15 months incarceration. At a future time, Arash was also ordered to pay restitution in the amount of $566,000 to cover the uncontested loss assessed which had been suffered by the purported victims of this scheme.[1]

At all times during the criminal proceedings, Arash was represented by attorney Ralph F. Hirschmann ("Hirschmann") of Los Angeles, California. Hirschmann, a licensed California attorney, advised Arash to plead guilty and negotiated a plea agreement on his behalf.[2] On the advice of counsel, Arash signed

---

[1] The losses were determined by a specialist AFTER reviewing uncontested statements by persons claiming to be victims who were never examined or questioned by ARASH's attorney. Arash had contended that many if not all the "victims" purchased stock irrespective of Arash's postings on the finance board and were day-trading, and that many had actually profited by their purchases and sales. Furthermore, there was evidence to suggest that some had only invested minimal funds and were now claiming huge losses in a scheme to profit from the criminal case. The restitution amount ordered by the Court was different from the SEC's calculations which were less and were also uncontested. Additionally, the SEC was in the process of obtaining a civil judgment again Arash for the loss it believed was suffered by the "victims."

[2] Initially during the negotiation process and prior to the written plea agreement and before any plea was taken, Hirschmann had been negotiating with

4

1  the plea agreement wherein Arash would plead guilty to Counts 1

2  and 2. See Exhibit 2 (Plea Agreement). As a condition of this

3  Agreement, the defendant would be assessed with restitution as

4  ordered by the Court. During the plea negotiations Hirschmann

5  never argued nor attempted to substitute the SEC's soon to be

6  obtained civil judgment in lieu of restitution being ordered by

7  the Court. Hirschmann also never attempted to set the amount of

8  restitution to a maximum of $10,000 or less even though the

9  Assistant United States Attorney never demanded a specific

10  amount to be paid, and the SEC had indicated it would be

11  obtaining a civil judgment for the amount it believed

---

AUSA Manuel Abascal ("Abascal"). Abascal had indicated that the possibility

of a prison sentence would depend on Arash's degree of cooperation. It should

be noted that Arash fully cooperated with the government and participated in

two very productive proffer sessions. AUSA Abascal even conceded that Arash's

information was valuable. Futhermore, Abascal was not requesting any specific

restitution amount and Hirschmann had the opportunity to substitute the civil

judgment in progress  by the SEC. This information was communicated to Arash

who believed that these would ultimately be the sentencing terms.

Approximately 2 weeks before the sentencing hearing, Hirschmann informed

Arash that he would have to do time and pay restitution. Hirschmann failed to

notify Arash that a new AUSA Steve Olson ("Olson") was now on the case and

was demanding a sentence of at least 15 months. Hirschmann also told Arash

that there would be no opposition to restitution even though the plea

agreement does not specify any restitution amount. Hirschmann told Arash that

nothing could be done and the matter was already settled. Arash relied to his

detriment on Hirschmann's representations.

represented loss to the victims.[3] (See Exhibit 1, Declaration of David Ross and Exhibit 3, Declaration of Arash Aziz-Golshani) The SEC was actively involved in the criminal prosecution and SEC representatives were present at various stages of the Court proceedings. At the time of the plea before the Court, Arash was never told by the Court or Hirschmann that a plea of guilty to these charges could have immigration consequences. See Exhibit 4 (Transcript of plea). Hirschmann actually told Arash that "everything with immigration could be fixed later." (See Exhibit 3, Declaration of Arash Aziz-Golshani)

Pursuant to 8 U.S.C. 1101(a)(43)(M)(I), any alien convicted of a crime of fraud wherein the loss to the victim is found to be by the criminal court in excess of $10,000 is deemed to have committed an aggravated felony. Furthermore, under 8 U.S.C. 1101(a)(43)(G) a sentence of 1 year or more is deemed an aggravated felony where the underlying crime involves theft, irrespective of actual time served.[4] Generally, fraud involving

---

[3] Pursuant to 8 U.S.C. 101(a)(43)(M)(I), a conviction for fraud is only an aggravated felony if the amount of loss to the victim as evidenced by the restitution ordered is more than $10,000. A civil judgment in excess of $10,000 outside of the criminal conviction does not supercede a judge's silence on loss to the victims or a finding of a loss of $10,000 or less to the victims. At the same time, a civil judgment acts the same as restitution in that the victims have a court ordered amount assessed against the defendant and are protected.

[4] Prior to a change in the law and the enactment of AEDPA in 1996, fraud pursuant to (a)(43)(M) of the INA required a loss of more than $200,000 to be

6

1   monetary matter, is also deemed a theft offense. In accordance
2   with 8 U.S.C. 1227(a)(2)(A)(iii), legal permanent residents who
3   are convicted of an aggravated felony are subject to permanent
4   removal and are barred from life from living in the United
5   States as residents. There is no waiver under section 212(h) of
6   the Immigration and Nationality for permanent residents even
7   though aliens who were never permanent residents are eligible
8   for the waiver of removal. This law has been in effect since
9   September 30, 1996, when the Illegal Immigration Reform and
10  Immigration Responsibility Act ("IIRIRA") was enacted. During
11  the entire criminal proceedings Arash was a permanent resident
12  of the United States, and as such, when deemed an aggravated
13  felon, is ineligible for a Section 212(h) waiver and permanently
14  removable and barred from living in the United States for life
15  as a resident. (See Exhibit 1, Declaration of David Ross)
16       Although Arash informed Hirschmann of his permanent
17  resident status and inquired whether or not by pleading guilty
18  according to the Plea Agreement he would be removable and suffer
19  immigration consequences, Hirschmann assured him that there
20  would be no permanent immigration consequences and any
21  immigration problem could be fixed subsequent to conviction.
22
23  _____
24  an aggravated felony and theft under (a)(43)(G) required a sentence of more
    than 5 years to be aggravated felony. AEDPA increased substantially the
25  definition of an aggravated felony and reduced the requirements for a crime
26  to constitute an aggravated felony. Hirschmann as a criminal specialist
27  should have been known of its existence by the year 2000 when Arash entered
28  into a plea agreement.

(See Declaration of Arash Aziz-Golshani, Exhibit 3 as well as the Declaration of Arash's uncle, Albert Bootesaz ("Albert") Exhibit 5, and declaration of Shahrokh Mokhtarzadeh, Attorney at Law (Exhibit 6).

Hirschmann never informed Arash of the consequences of being deemed an aggravated felon as it relates to immigration matters, and actually provided erroneous information to Arash that there would be no problem, after consulting by phone with an immigration attorney. Hirschmann never identified the attorney to either Arash or Albert.

Hirschmann made no attempt to negotiate a plea with the AUSA wherein a sentence of less than 1 year would be imposed and restitution would be separate from the underlying charge by way of a civil settlement thereby precluding a finding that the conviction was an aggravated felony. Hirschmann did not attempt during the pre-sentencing process to discuss restitution with the officer preparing the Pre-Sentencing Report nor did he file any statement in support of a civil judgment in lieu of restitution being assessed. At the sentencing hearing Hirschmann never requested the Court to consider abstaining from assessing restitution in light of the SEC's stated intent at the time of obtaining a civil judgment for any losses suffered, nor did he object to the restitution amount. The amount of restitution in the criminal case is dispositive as to the loss of the victim for immigration purposes.

/ / /

/ / /

1    Hirschmann never filed a single motion in the case and did

2    not argue in writing any possible defenses in an attempt to

3    reduce the sentence and remove restitution from the criminal

4    matter and place it solely in the civil arena which the SEC did

5    anyway by way of a civil judgment. (See Exhibit 1, Declaration

6    of David Ross) Arash had several viable possible defenses,

7    including the following:

8         A.   The only witness against Arash was Arash Molayem

9              ("Molayem") who had lied to the investigators

10             about not continuing to engage in the subject

11             activity for which the criminal charges were

12             brought, AFTER being arrested and becoming an

13             informant for the government. In fact, Molayem

14             did continue to engage in such activities and the

15             matter was made known to Hirschmann by Arash.[5]

16             Additionally, Molayem lied about the role of

17             himself and others in the activities which were

18             the subject of the indictment.[6] Molayem's

---

[5] Initially, it was not known that Molayem continued to engage in the subject

activity. Only after Arash first met with the AUSA was the matter known.

Arash then asked Hirschmann to give his information to the AUSA.

[6] Hirschmann acknowledges in his Sentencing Memorandum, page 7, that "Molayem

misstated the roles of others… and understated his own role." Hirschmann

further states that Arash's information about Molayem's misstatement "aided

the government in correcting its understanding about the actual roles of

various participants… avoiding mistakes in a superseding indictment of

Melamed."

credibility was now subject to a strong impeachment examination. Molayem's testimony, according to Hirschmann and the tape of an alleged conversation between Arash and Molayem were the reasons for the plea.[7] However, Hirschmann did not use this information as a defense to be presented at trial, to garner a better plea agreement, or to obtain a greater downward departure. Additionally, Molayem's credibility was further tarnished by his false accusation of illegal activity by the CEO of ICHARGEIT, Jesse Cohen ("Cohen"). Molayem accused Cohen of manipulating ICHARGEIT stock and tried to implicate Cohen in the conspiracy. Arash told the AUSA that the accusation was false and Cohen was never charged with any crime. This fact could have solidified the impeachment of Molayem and shown that he was motivated and in fact lied about anything and anyone to escape going to jail. Hirschmann ignored this and never argued it as part of a trial strategy or plea agreement.

---

[7] The tape given to counsel by Hirschmann is completely inaudible and it is impossible to identify who is speaking and what is said. However, notwithstanding this, the AUSA presented Hirschmann with a transcript of the purported conversation. Hirschmann never challenged the veracity of the transcript or how it was obtained given the defective recording tape.

B.   The charges against Arash were predicated upon postings in internet message boards, open to the public and in which one was free to express one's opinion, disseminate information, and share thoughts with others. These messages were not presented as professional data and only constituted opinions, rumors, and other data which the public had reason to doubt and know was unproven and unreliable. The persons generally reading these messages were sophisticated and experienced market traders and knew the risks in relying on anonymous information which was speculative at best and unproven. In effect, the persons using message boards for financial information from anonymous sources are doing little more than gambling, with each person hoping to find his/her magic stock. Hirschmann never argued the First Amendment issues inherent in the acts charged and never went before the Court in any motion to dismiss based on constitutional grounds. Hirschmann never advanced any arguments to the AUSA that the charges should be dropped or at least modified to a non-aggravated felony category or there be no restitution in the criminal case and the sentence be less than one year, given the constitutional questions present.

11

C.   The tape purportedly demonstrating Arash's
acknowledgment of guilt was unintelligible.
Hirschmann refused to allow Arash to hear the
tape even after repeated requests by him and his
uncle Albert Bootesaz ("Albert") to listen in
order to have the opportunity to challenge the
statements being presented by the AUSA. (See
Declarations of Arash and Albert, Exhibits 3 and
5) Hirschmann should have moved to exclude the
tape or at the very minimum force an evidentiary
hearing into the creation of transcript from an
unintelligible tape. Furthermore, at a trial this
issue would have additional import on Molayem's
credibility. Four other tapes were made by the
investigators, none of which were dispositive as
to any admission of guilt by Arash and it is
extremely difficult to even know if the voice on
the tape was that of Arash. Again, the only
witness to these tapes was Molayem whose
credibility was minimized by his continued lies
and extreme desire to escape punishment.

As a result of Hirschmann's failure to notify Arash of the
consequences of his plea as to his immigration status, and the
misinformation and affirmative act of negligence by Hirschmann
in providing incorrect information, Arash was deemed an
aggravated felon by the Immigration Judge and ordered
permanently removed from the United States. Arash is also

permanently barred from obtaining residency in the United

States. Unless Arash is able to amend this judgment regarding

his sentence and restitution, he is subject to removal (Please

refer to Order from the Immigration Judge attached here, Exhibit

7 and Declaration of David Ross, Exhibit 1)

**REQUIREMENTS FOR WRIT OF ERROR CORUM NOBIS**

Corum Nobis is an extraordinary writ, used only to review

errors of the most fundamental type. "The writ of error corum

nobis affords a remedy to attach a conviction when the

petitioner has served his sentence and is no longer in custody."

United States vs. Kwan, 407 F. 3d 105, 109 (9th Circ. 2005)

Specifically, "the writ provides a remedy for those suffering

from the lingering collateral consequences of an

unconstitutional or unlawful conviction based on errors of fact

and egregious legal errors." Id.

To obtain corum nobis relief, the petitioner must establish

(1) that a more usual remedy is not available; (2) that valid

reasons exist for not attacking the conviction earlier; (3) that

adverse consequences exist from the conviction sufficient to

satisfy the case or controversy requirement of Article III.; and

(4) that the error is of a fundamental character. Hirabayashi vs.

United States, 828 F 2d 591, 604 (9th Cir 1987).

Mr. Golshani has satisfied each of these conditions. He is

no longer in custody and therefore the more traditional post

conviction remedy, habeas corpus petition, is no longer

available. Secondly, he consulted with various attorneys in an

effort to address his predicament and learn what could be done

13

to vacate this conviction and to remove this permanent bar of residence and citizenship. He was consistently told that he could not obtain relief. Under prevailing law prior to Padilla vs. Kentucky, 559 US ___, 130 S. Ct 1473(2010) the issue was whether the ineffective assistance of counsel was due to misinformation as opposed to no information being given. See U.S. vs. Kwan, supra; Strickland vs. Washington, 466 US 8 (1984).

The decision in Padilla vs. Kentucky, supra, changed that. The Supreme Court rejected the distinction "between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under Strickland 466 US, 869. The majority opinion in Padilla held that the duty of trial counsel was to advise of potential immigration consequences, including advising a defendant of clear immigration consequences. Padilla now covers situations where even if there is no affirmative misadvice by counsel, failure to advise is sufficient to trigger a claim for ineffective assistance of counsel. It was clear in this case that the guilty plea to an aggravated felony would permanently bar residence and naturalization and it was therefore Mr. Hirschmann's duty to so advise Mr. Golshani. After the decision in Padilla, the defendant has the possibility of relief and therefore retained counsel to file this petition. Under U.S.A. vs. Kwan, supra, it was held that there was no statute of limitations for Corum Nobis petitions. 407 F 3d 1014.

/ / /

14

Concerning the third factor regarding Corum Nobis relief, adverse consequences do exist as a result of this guilty plea. It is clear that the defendant is barred from ever becoming a lawful permanent resident and remains deportable. (See Exhibit 1, Declaration of David Ross)

On the final factor, the error is of fundamental character, because it arose from counsel's failure to inform Mr. Golshani of the direct and dire immigration consequences of his guilty plea. A claim of ineffective assistance is sufficient to demonstrate an error fundamental in character, so that it can show (1) deficient performance that (2) prejudiced him. Kwan, supra, at 1014 citing Strickland vs. Washington, 466 U.S. 668 (1984). As noted previously, Padilla made clear that deficient performance can arise not only from affirmatively misrepresenting immigration law but also omitting the clear and certain advice that the aggravated felony conviction in this case would render Petitioner permanently deportable and barred for life from residency and naturalization; See Padilla, supra, at 1484.

The petitioner contends that it is quite clear that the legal standard has been met for a Corum Nobis relief in this matter and the fundamental error requirement is established by the fact that the Petitioner received ineffective assistance of counsel. (United States vs. Mett, 65 F 3d 1531, 1534). To establish ineffective assistance of counsel, the petitioner must prove that his counsel's performance fell below an objective standard of reasonableness, and that the deficiency in his

counsel's performance prejudiced him. <u>Strictland vs. Washington</u>, 466 US 688, 692 (1984).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Under <u>Padilla</u>, failure to advise of the impendency of a negative immigration consequence constitutes ineffective assistance of counsel. In the instant matter, Hirschmann did not tell Petitioner he would be permanently deportable and barred for life from obtaining residency and naturalization. Instead Hirschmann, by omission, failed to fully apprise Petitioner of the consequences of his plea. Petitioner was prejudiced by Hirschmann's omission because Petitioner had several defenses, enumerated above, which he could have invoked in lieu of pleading guilty.

Furthermore, even under a more stringent standard, Petitioner has proven ineffective assistance of counsel because Hirschmann not only omitted information he misinformed Petitioner of the consequences. See <u>United States</u> v. <u>Kwan</u>, 407 F. 3d 1005 (2005).

In <u>Kwan</u> the court held that defense counsel must keep abreast of significant changes in the law, even those that impact his client's immigration status. The court went on to indicate that it is no excuse if the attorney misled his client out of ignorance. (<u>U.S.</u> v. <u>Kwan</u>, supra, at p. 1016) Even though counsel in <u>Kwan</u> was not an immigration specialist he held himself out to his client as an expert when he made the affirmative representation that he had knowledge that there would be no immigration consequences.

In the instant matter as in Kwan, Golshani's counsel misled him and affirmatively misrepresented the deportation consequences of his guilty plea.  Additionally, he did not attempt to set a limit for restitution in the plea agreement or use a civil judgment pending before the SEC in lieu of restitution.  Hirschmann made no attempt to have the restitution issue adjudicated separately from the underlying criminal charge so as to keep the loss to the victim at $10,000 or less, and thereby avoid an aggravated felony.  See Chang v. INS., 307 F3rd 1185 (9th Circuit 2002).  In the Chang matter the defendant plead guilty to fraud and entered into a plea agreement whereby the loss of the victim was set about $600 with restitution separately agreed to in excess of $10,000.  The 9th Circuit held that for purposes of the aggravated felony rule, the immigration judge was bound by the amounts stipulated to in a plea agreement and notwithstanding that the pre-sentence report indicated a loss of $30,000. Hirschmann did not propound any usable defenses instead had the Petitioner plead guilty, even though these defenses were viable. Thus, Petitioner was prejudiced by Hirschmann's omissions and misinformation.

Defense counsel did not inform Golshani that as a result of the passage of the Illegal Immigration Reform Immigrant Responsibility Act of 1996 ("IIRIRA") in September of 1996 and the resulting change in the definition of an aggravated felony, that he was about to plead guilty to an offense that would almost certainly cause him to be deported.  The guilty plea in this matter was several years after the passage of "IIRRIRA".

17

In its holding, the Kwan panel also relied on "contemporary standards of professional competence", and referred to the Code of Professional Conduct that instructed defense counsel to possess the requisite level of knowledge necessary to effectively serve the interest of the client.  The court in Kwan stated, "that counsel may have misled Kwan out of ignorance is no excuse.  It is a basic rule of professional conduct that a lawyer must maintain competence by keeping abreast of changes in the law and its practice.  See, e.g., ABA Model Rules of Professional Conduct, Rule 1.1 (6)... counsel's performance also fell below the American Bar Association's ethical standard for criminal defense attorneys with respect to immigration consequences.

The Kwan panel also stated that "counsel never explored the option of renegotiating the plea agreement with the prosecution as to avoid the deportation consequences."  ID. at 1005.  It is our contention that the same is true here.

**PADILLA VS. KENTUCKY 559 US, - 130 S. Ct. 1473 (2010)**

As noted above, Padilla vs. Kentucky, 559 US _ (2010), decided that a criminal defense attorney had the affirmative duty to inform his clients of the actual immigration consequences before making a plea. That is, the attorney either had to learn what those consequences were or confirm them with an immigration specialist prior to a plea. The failure by the attorney to do so could be prejudicial and a plea can be vacated, especially where the Defendant may have had some viable defenses to the charges.

18

*Padilla* is applied retroactively and therefore is applicable to the instant matter. (Please refer to paragraph 9 in the Declaration of David Ross, attorney, Exhibit 1). The authorities cited include U.S. vs. Denedo, 129 S. Ct. 2213, 173 L. Ed. 2d 1235 (2009); U.S. vs. Diaz Palmerin 2011 U.S. Dist. LEXIS 37151 (E.D. Ill, 2011); U.S. vs. Chaidez, 730 F. Supp 2d 896 (N.D. Ill, 2010); and Soto vs. U.S.A., 2011 U.S. Dist. LEXIS 9186 (D.C. NJ, 2011)

In the instant matter, Hirschmann never informed Arash of the actual immigration consequences although he allegedly conferred with an immigration attorney. It is very difficult to believe that an experienced immigration attorney would not have advised Mr. Hirschmann of the drastic consequences regarding immigration status and naturalization that would surely result from the proposed plea and sentence in this case. In any even Hirschmann did not provide this information to Golshani and, pursuant to *Padilla*, his failure to do so was prejudicial and the plea should be vacated or at least the sentence modified as specified above.

Date: August 4, 2011                    Respectfully submitted,


                                        _____/S/_____
                                        ARTHUR AVAZIAN
                                        ATTORNEY FOR DEFENDANT
                                        ARASH AZIZ-GOLSHANI