Arthur Avazian
AVAZIAN & AVAZIAN
California Bar Number: 41250
800 WILSHIRE BOULEVARD, SUITE 1500
LOS ANGELES, CALIFORNIA 90017-2619
TELEPHONE (213) 624-1793
FACSIMILE (213) 891-2890
E-MAIL: AAVAZIAN@AVAZIANLAW.COM



FILED
CLERK, U.S. DISTRICT COURT

AUG 1 2 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Attorney for Petitioner/Defendant ARASH AZIZ-GOLSHANI



51D

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV11-6657 GAF

UNITED STATES OF AMERICA,      ) CASE NUMBER: CR 00-07-GAF
                               )
                Plaintiff,     ) DEFENDANT'S PETITION FOR WRIT
                               ) OF CORAM NOBIS; MOTION TO
        v.                     ) VACATE AND AMEND JUDGMENT AND
                               ) SENTENCE (ALL WRITS ACT 28
ARASH AZIZ-GOLSHANI,           ) U.S.C. Sec. 1651 (a))
                               )
        Petitioner/Defendant.  )
                               ) DATE:
                               ) TIME:
                               ) JUDGE:
                               ) HON. GARY ALLEN FEESS
                               )
_____)

   TO: THE HONORABLE GARY ALLEN FEESS, UNITED STATES DISTRICT

COURT JUDGE; OFFICE OF THE UNITED STATES ATTORNEY, CENTRAL

DISTRICT:

   Defendant, Arash Aziz-Golshani, by and through his counsel,

Arthur Avazian, respectfully submits this Petition for Writ of

Corum Nobis to challenge the validity of his conviction, and in

particular his plea of guilty on March 15, 2000 and his

subsequent sentencing on January 22, 2001. The factual and legal

1

grounds for said petition are set forth hereafter in the
Memorandum of Points and Authorities.   Defendant also seeks to
vacate the conviction under the All Writs Act, 28 U.S.C. Sec.
1651(a).


August 11, 2011

ARTHUR AVAZIAN
Attorney for Defendant
ARASH AZIZ-GOLSHANI

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

On March 15, 2000, before this Honorable Court, Defendant, ARASH AZIZ-GOLSHANI ("Arash"), entered a plea of guilty to securities fraud in violation of 15 U.S.C 78. It is Defendant's contention in this Petition that he received ineffective assistance of counsel prior to and during the entry of his plea of guilty in this matter as well as the time of his sentencing on January 22, 2001.

Arash entered the United States in 1985 when he was nine years old, with his immediate family, all of whom live in the United States and are United States citizens. Arash was a permanent resident of the United States and had not yet achieved naturalization at the time of this conviction. After Arash served a 15 month prison sentence, he was detained by Immigration and charged with deportability based on this conviction, which is classified as an aggravated felony. Because of the current conditions in Iran (Arash's birthplace), the Immigration Judge granted withholding of removal. This relief does not allow Arash to maintain his permanent resident status and can be later revoked if conditions in Iran change. (Please refer to Exhibit 1, Declaration of David Ross, Arash's immigration attorney)

At the time of his plea, Arash had just graduated from U.C.L.A. with a Bachelors Degree in Anthropology. The facts of his violation of law consisted of buying with friends "penny stocks" and posting messages on the internet finance message

boards regaling the stocks. Upon the stocks increasing in value, Arash and his friends would then sell the stocks at a profit.

On March 15, 2000, Arash pled guilty to 18 U.S.C. 371 and 15 U.S.C. 78j and was sentenced on January 22, 2001 by Judge Feess, who imposed the sentence of 15 months incarceration. At a future time, Arash was also ordered to pay restitution in the amount of $566,000 to cover the uncontested loss assessed which had been suffered by the purported victims of this scheme.[1]

At all times during the criminal proceedings, Arash was represented by attorney Ralph F. Hirschmann ("Hirschmann") of Los Angeles, California. Hirschmann, a licensed California attorney, advised Arash to plead guilty and negotiated a plea agreement on his behalf.[2] On the advice of counsel, Arash signed

---

[1] The losses were determined by a specialist AFTER reviewing uncontested statements by persons claiming to be victims who were never examined or questioned by ARASH's attorney. Arash had contended that many if not all the "victims" purchased stock irrespective of Arash's postings on the finance board and were day-trading, and that many had actually profited by their purchases and sales. Furthermore, there was evidence to suggest that some had only invested minimal funds and were now claiming huge losses in a scheme to profit from the criminal case. The restitution amount ordered by the Court was different from the SEC's calculations which were less and were also uncontested. Additionally, the SEC was in the process of obtaining a civil judgment again Arash for the loss it believed was suffered by the "victims."

[2] Initially during the negotiation process and prior to the written plea agreement and before any plea was taken, Hirschmann had been negotiating with

4

the plea agreement wherein Arash would plead guilty to Counts 1
and 2. See Exhibit 2 (Plea Agreement). As a condition of this
Agreement, the defendant would be assessed with restitution as
ordered by the Court. During the plea negotiations Hirschmann
never argued nor attempted to substitute the SEC's soon to be
obtained civil judgment in lieu of restitution being ordered by
the Court. Hirschmann also never attempted to set the amount of
restitution to a maximum of $10,000 or less even though the
Assistant United States Attorney never demanded a specific
amount to be paid, and the SEC had indicated it would be
obtaining a civil judgment for the amount it believed

---

AUSA Manuel Abascal ("Abascal"). Abascal had indicated that the possibility
of a prison sentence would depend on Arash's degree of cooperation. It should
be noted that Arash fully cooperated with the government and participated in
two very productive proffer sessions. AUSA Abascal even conceded that Arash's
information was valuable. Futhermore, Abascal was not requesting any specific
restitution amount and Hirschmann had the opportunity to substitute the civil
judgment in progress by the SEC. This information was communicated to Arash
who believed that these would ultimately be the sentencing terms.
Approximately 2 weeks before the sentencing hearing, Hirschmann informed
Arash that he would have to do time and pay restitution. Hirschmann failed to
notify Arash that a new AUSA Steve Olson ("Olson") was now on the case and
was demanding a sentence of at least 15 months. Hirschmann also told Arash
that there would be no opposition to restitution even though the plea
agreement does not specify any restitution amount. Hirschmann told Arash that
nothing could be done and the matter was already settled. Arash relied to his
detriment on Hirschmann's representations.

represented loss to the victims.[3] (See Exhibit 1, Declaration of David Ross and Exhibit 3, Declaration of Arash Aziz-Golshani) The SEC was actively involved in the criminal prosecution and SEC representatives were present at various stages of the Court proceedings. At the time of the plea before the Court, Arash was never told by the Court or Hirschmann that a plea of guilty to these charges could have immigration consequences. See Exhibit 4 (Transcript of plea). Hirschmann actually told Arash that "everything with immigration could be fixed later." (See Exhibit 3, Declaration of Arash Aziz-Golshani)

Pursuant to 8 U.S.C. 1101(a)(43)(M)(I), any alien convicted of a crime of fraud wherein the loss to the victim is found to be by the criminal court in excess of $10,000 is deemed to have committed an aggravated felony. Furthermore, under 8 U.S.C. 1101(a)(43)(G) a sentence of 1 year or more is deemed an aggravated felony where the underlying crime involves theft, irrespective of actual time served.[4] Generally, fraud involving

---

[3] Pursuant to 8 U.S.C. 101(a)(43)(M)(I), a conviction for fraud is only an aggravated felony if the amount of loss to the victim as evidenced by the restitution ordered is more than $10,000. A civil judgment in excess of $10,000 outside of the criminal conviction does not supercede a judge's silence on loss to the victims or a finding of a loss of $10,000 or less to the victims. At the same time, a civil judgment acts the same as restitution in that the victims have a court ordered amount assessed against the defendant and are protected.

[4] Prior to a change in the law and the enactment of AEDPA in 1996, fraud pursuant to (a)(43)(M) of the INA required a loss of more than $200,000 to be

monetary matter, is also deemed a theft offense. In accordance with 8 U.S.C. 1227(a)(2)(A)(iii), legal permanent residents who are convicted of an aggravated felony are subject to permanent removal and are barred from life from living in the United States as residents. There is no waiver under section 212(h) of the Immigration and Nationality for permanent residents even though aliens who were never permanent residents are eligible for the waiver of removal. This law has been in effect since September 30, 1996, when the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA") was enacted. During the entire criminal proceedings Arash was a permanent resident of the United States, and as such, when deemed an aggravated felon, is ineligible for a Section 212(h) waiver and permanently removable and barred from living in the United States for life as a resident. (See Exhibit 1, Declaration of David Ross)

Although Arash informed Hirschmann of his permanent resident status and inquired whether or not by pleading guilty according to the Plea Agreement he would be removable and suffer immigration consequences, Hirschmann assured him that there would be no permanent immigration consequences and any immigration problem could be fixed subsequent to conviction.

---

an aggravated felony and theft under (a)(43)(G) required a sentence of more than 5 years to be aggravated felony. AEDPA increased substantially the definition of an aggravated felony and reduced the requirements for a crime to constitute an aggravated felony. Hirschmann as a criminal specialist should have been known of its existence by the year 2000 when Arash entered into a plea agreement.

(See Declaration of Arash Aziz-Golshani, Exhibit 3 as well as the Declaration of Arash's uncle, Albert Bootesaz ("Albert") Exhibit 5, and declaration of Shahrokh Mokhtarzadeh, Attorney at Law (Exhibit 6).

Hirschmann never informed Arash of the consequences of being deemed an aggravated felon as it relates to immigration matters, and actually provided erroneous information to Arash that there would be no problem, after consulting by phone with an immigration attorney. Hirschmann never identified the attorney to either Arash or Albert.

Hirschmann made no attempt to negotiate a plea with the AUSA wherein a sentence of less than 1 year would be imposed and restitution would be separate from the underlying charge by way of a civil settlement thereby precluding a finding that the conviction was an aggravated felony. Hirschmann did not attempt during the pre-sentencing process to discuss restitution with the officer preparing the Pre-Sentencing Report nor did he file any statement in support of a civil judgment in lieu of restitution being assessed. At the sentencing hearing Hirschmann never requested the Court to consider abstaining from assessing restitution in light of the SEC's stated intent at the time of obtaining a civil judgment for any losses suffered, nor did he object to the restitution amount. The amount of restitution in the criminal case is dispositive as to the loss of the victim for immigration purposes.

/ / /

/ / /

1    Hirschmann never filed a single motion in the case and did

2  not argue in writing any possible defenses in an attempt to

3  reduce the sentence and remove restitution from the criminal

4  matter and place it solely in the civil arena which the SEC did

5  anyway by way of a civil judgment. (See Exhibit 1, Declaration

6  of David Ross) Arash had several viable possible defenses,

7  including the following:

8    A.    The only witness against Arash was Arash Molayem

9          ("Molayem") who had lied to the investigators

10         about not continuing to engage in the subject

11         activity for which the criminal charges were

12         brought, AFTER being arrested and becoming an

13         informant for the government. In fact, Molayem

14         did continue to engage in such activities and the

15         matter was made known to Hirschmann by Arash.[5]

16         Additionally, Molayem lied about the role of

17         himself and others in the activities which were

18         the subject of the indictment.[6] Molayem's

19

20  [5] Initially, it was not known that Molayem continued to engage in the subject

21  activity. Only after Arash first met with the AUSA was the matter known.

22  Arash then asked Hirschmann to give his information to the AUSA.

23  [6] Hirschmann acknowledges in his Sentencing Memorandum, page 7, that "Molayem

24  misstated the roles of others... and understated his own role." Hirschmann

25  further states that Arash's information about Molayem's misstatement "aided

26  the government in correcting its understanding about the actual roles of

27  various participants... avoiding mistakes in a superseding indictment of

28  Melamed."

credibility was now subject to a strong
impeachment examination. Molayem's testimony,
according to Hirschmann and the tape of an
alleged conversation between Arash and Molayem
were the reasons for the plea.[7] However,
Hirschmann did not use this information as a
defense to be presented at trial, to garner a
better plea agreement, or to obtain a greater
downward departure. Additionally, Molayem's
credibility was further tarnished by his false
accusation of illegal activity by the CEO of
ICHARGEIT, Jesse Cohen ("Cohen"). Molayem accused
Cohen of manipulating ICHARGEIT stock and tried
to implicate Cohen in the conspiracy. Arash told
the AUSA that the accusation was false and Cohen
was never charged with any crime. This fact could
have solidified the impeachment of Molayem and
shown that he was motivated and in fact lied
about anything and anyone to escape going to
jail. Hirschmann ignored this and never argued it
as part of a trial strategy or plea agreement.

---

[7] The tape given to counsel by Hirschmann is completely inaudible and it is
impossible to identify who is speaking and what is said. However,
notwithstanding this, the AUSA presented Hirschmann with a transcript of the
purported conversation. Hirschmann never challenged the veracity of the
transcript or how it was obtained given the defective recording tape.

B.   The charges against Arash were predicated upon postings in internet message boards, open to the public and in which one was free to express one's opinion, disseminate information, and share thoughts with others. These messages were not presented as professional data and only constituted opinions, rumors, and other data which the public had reason to doubt and know was unproven and unreliable. The persons generally reading these messages were sophisticated and experienced market traders and knew the risks in relying on anonymous information which was speculative at best and unproven. In effect, the persons using message boards for financial information from anonymous sources are doing little more than gambling, with each person hoping to find his/her magic stock. Hirschmann never argued the First Amendment issues inherent in the acts charged and never went before the Court in any motion to dismiss based on constitutional grounds. Hirschmann never advanced any arguments to the AUSA that the charges should be dropped or at least modified to a non-aggravated felony category or there be no restitution in the criminal case and the sentence be less than one year, given the constitutional questions present.

C.   The tape purportedly demonstrating Arash's
     acknowledgment of guilt was unintelligible.
     Hirschmann refused to allow Arash to hear the
     tape even after repeated requests by him and his
     uncle Albert Bootesaz ("Albert") to listen in
     order to have the opportunity to challenge the
     statements being presented by the AUSA. (See
     Declarations of Arash and Albert, Exhibits 3 and
     5) Hirschmann should have moved to exclude the
     tape or at the very minimum force an evidentiary
     hearing into the creation of transcript from an
     unintelligible tape. Furthermore, at a trial this
     issue would have additional import on Molayem's
     credibility. Four other tapes were made by the
     investigators, none of which were dispositive as
     to any admission of guilt by Arash and it is
     extremely difficult to even know if the voice on
     the tape was that of Arash. Again, the only
     witness to these tapes was Molayem whose
     credibility was minimized by his continued lies
     and extreme desire to escape punishment.

As a result of Hirschmann's failure to notify Arash of the
consequences of his plea as to his immigration status, and the
misinformation and affirmative act of negligence by Hirschmann
in providing incorrect information, Arash was deemed an
aggravated felon by the Immigration Judge and ordered
permanently removed from the United States. Arash is also

permanently barred from obtaining residency in the United
States. Unless Arash is able to amend this judgment regarding
his sentence and restitution, he is subject to removal (Please
refer to Order from the Immigration Judge attached here, Exhibit
7 and Declaration of David Ross, Exhibit 1)

### REQUIREMENTS FOR WRIT OF ERROR CORUM NOBIS

Corum Nobis is an extraordinary writ, used only to review
errors of the most fundamental type. "The writ of error corum
nobis affords a remedy to attach a conviction when the
petitioner has served his sentence and is no longer in custody."
United States vs. Kwan, 407 F. 3d 105, 109 (9th Circ. 2005)
Specifically, "the writ provides a remedy for those suffering
from the lingering collateral consequences of an
unconstitutional or unlawful conviction based on errors of fact
and egregious legal errors." Id.

To obtain corum nobis relief, the petitioner must establish
(1)that a more usual remedy is not available; (2)that valid
reasons exist for not attacking the conviction earlier; (3)that
adverse consequences exist from the conviction sufficient to
satisfy the case or controversy requirement of Article III.; and
(4)that the error is of a fundamental character. Hirabayashi vs.
United States, 828 F 2d 591, 604 (9th Cir 1987).

Mr. Golshani has satisfied each of these conditions. He is
no longer in custody and therefore the more traditional post
conviction remedy, habeas corpus petition, is no longer
available. Secondly, he consulted with various attorneys in an
effort to address his predicament and learn what could be done

1   to vacate this conviction and to remove this permanent bar of
2   residence and citizenship. He was consistently told that he
3   could not obtain relief. Under prevailing law prior to Padilla
4   vs. Kentucky, 559 US ___, 130 S. Ct 1473(2010) the issue was
5   whether the ineffective assistance of counsel was due to
6   misinformation as opposed to no information being given. See
7   U.S. vs. Kwan, supra; Strickland vs. Washington, 466 US 8
8   (1984).

9       The decision in Padilla vs. Kentucky, supra, changed that.
10  The Supreme Court rejected the distinction "between direct and
11  collateral consequences to define the scope of constitutionally
12  'reasonable professional assistance' required under Strickland
13  466 US, 869. The majority opinion in Padilla held that the duty
14  of trial counsel was to advise of potential immigration
15  consequences, including advising a defendant of clear
16  immigration consequences. Padilla now covers situations where
17  even if there is no affirmative misadvice by counsel, failure to
18  advise is sufficient to trigger a claim for ineffective
19  assistance of counsel. It was clear in this case that the guilty
20  plea to an aggravated felony would permanently bar residence and
21  naturalization and it was therefore Mr. Hirschmann's duty to so
22  advise Mr. Golshani. After the decision in Padilla, the
23  defendant has the possibility of relief and therefore retained
24  counsel to file this petition. Under U.S.A. vs. Kwan, supra, it
25  was held that there was no statute of limitations for Corum
26  Nobis petitions. 407 F 3d 1014.
27  / / /
28

14

1    Concerning the third factor regarding Corum Nobis relief,
2  adverse consequences do exist as a result of this guilty plea.
3  It is clear that the defendant is barred from ever becoming a
4  lawful permanent resident and remains deportable. (See Exhibit
5  1, Declaration of David Ross)

6    On the final factor, the error is of fundamental character,
7  because it arose from counsel's failure to inform Mr. Golshani
8  of the direct and dire immigration consequences of his guilty
9  plea. A claim of ineffective assistance is sufficient to
10  demonstrate an error fundamental in character, so that it can
11  show (1) deficient performance that (2) prejudiced him. Kwan,
12  supra, at 1014 citing Strickland vs. Washington, 466 U.S. 668
13  (1984). As noted previously, Padilla made clear that deficient
14  performance can arise not only from affirmatively
15  misrepresenting immigration law but also omitting the clear and
16  certain advice that the aggravated felony conviction in this
17  case would render Petitioner permanently deportable and barred
18  for life from residency and naturalization; See Padilla, supra,
19  at 1484.

20    The petitioner contends that it is quite clear that the
21  legal standard has been met for a Corum Nobis relief in this
22  matter and the fundamental error requirement is established by
23  the fact that the Petitioner received ineffective assistance of
24  counsel. (United States vs. Mett, 65 F 3d 1531, 1534). To
25  establish ineffective assistance of counsel, the petitioner must
26  prove that his counsel's performance fell below an objective
27  standard of reasonableness, and that the deficiency in his
28

15

1  counsel's performance prejudiced him. Strictland vs. Washington,

2  466 US 688, 692 (1984).

3  ## INEFFECTIVE ASSISTANCE OF COUNSEL

4  Under Padilla, failure to advise of the impendency of a

5  negative immigration consequence constitutes ineffective

6  assistance of counsel. In the instant matter, Hirschmann did not

7  tell Petitioner he would be permanently deportable and barred

8  for life from obtaining residency and naturalization. Instead

9  Hirschmann, by omission, failed to fully apprise Petitioner of

10  the consequences of his plea. Petitioner was prejudiced by

11  Hirschmann's omission because Petitioner had several defenses,

12  enumerated above, which he could have invoked in lieu of

13  pleading guilty.

14  Furthermore, even under a more stringent standard,

15  Petitioner has proven ineffective assistance of counsel because

16  Hirschmann not only omitted information he misinformed

17  Petitioner of the consequences. See United States v. Kwan, 407

18  F. 3d 1005 (2005).

19  In Kwan the court held that defense counsel must keep

20  abreast of significant changes in the law, even those that

21  impact his client's immigration status. The court went on to

22  indicate that it is no excuse if the attorney misled his client

23  out of ignorance. (U.S. v. Kwan, supra, at p. 1016) Even though

24  counsel in Kwan was not an immigration specialist he held

25  himself out to his client as an expert when he made the

26  affirmative representation that he had knowledge that there

27  would be no immigration consequences.

28

16

In the instant matter as in <u>Kwan</u>, Golshani's counsel misled him and affirmatively misrepresented the deportation consequences of his guilty plea.  Additionally, he did not attempt to set a limit for restitution in the plea agreement or use a civil judgment pending before the SEC in lieu of restitution.  Hirschmann made no attempt to have the restitution issue adjudicated separately from the underlying criminal charge so as to keep the loss to the victim at $10,000 or less, and thereby avoid an aggravated felony.  See <u>Chang v. INS</u>., 307 F3rd 1185 (9th Circuit 2002).  In the <u>Chang</u> matter the defendant plead guilty to fraud and entered into a plea agreement whereby the loss of the victim was set about $600 with restitution separately agreed to in excess of $10,000.  The 9th Circuit held that for purposes of the aggravated felony rule, the immigration judge was bound by the amounts stipulated to in a plea agreement and notwithstanding that the pre-sentence report indicated a loss of $30,000. Hirschmann did not propound any usable defenses instead had the Petitioner plead guilty, even though these defenses were viable. Thus, Petitioner was prejudiced by Hirschmann's omissions and misinformation.

Defense counsel did not inform Golshani that as a result of the passage of the Illegal Immigration Reform Immigrant Responsibility Act of 1996 ("IIRIRA") in September of 1996 and the resulting change in the definition of an aggravated felony, that he was about to plead guilty to an offense that would almost certainly cause him to be deported.  The guilty plea in this matter was several years after the passage of "IIRRIRA".

1  In its holding, the Kwan panel also relied on "contemporary

2  standards of professional competence", and referred to the Code

3  of Professional Conduct that instructed defense counsel to

4  possess the requisite level of knowledge necessary to

5  effectively serve the interest of the client.  The court in Kwan

6  stated, "that counsel may have misled Kwan out of ignorance is

7  no excuse.  It is a basic rule of professional conduct that a

8  lawyer must maintain competence by keeping abreast of changes in

9  the law and its practice.  See, e.g., ABA Model Rules of

10 Professional Conduct, Rule 1.1 (6)... counsel's performance also

11 fell below the American Bar Association's ethical standard for

12 criminal defense attorneys with respect to immigration

13 consequences.

14      The Kwan panel also stated that "counsel never explored the

15 option of renegotiating the plea agreement with the prosecution

16 as to avoid the deportation consequences."  ID. at 1005.  It is

17 our contention that the same is true here.

18          **PADILLA VS. KENTUCKY 559 US, - 130 S. Ct. 1473 (2010)**

19      As noted above, Padilla vs. Kentucky, 559 US _ (2010),

20 decided that a criminal defense attorney had the affirmative

21 duty to inform his clients of the actual immigration

22 consequences before making a plea. That is, the attorney either

23 had to learn what those consequences were or confirm them with

24 an immigration specialist prior to a plea. The failure by the

25 attorney to do so could be prejudicial and a plea can be

26 vacated, especially where the Defendant may have had some viable

27 defenses to the charges.

28

1    Padilla is applied retroactively and therefore is
2    applicable to the instant matter. (Please refer to paragraph 9
3    in the Declaration of David Ross, attorney, Exhibit 1). The
4    authorities cited include U.S. vs. Denedo, 129 S. Ct. 2213, 173
5    L. Ed. 2d 1235 (2009); U.S. vs. Diaz Palmerin 2011 U.S. Dist.
6    LEXIS 37151 (E.D. Ill, 2011); U.S. vs. Chaidez, 730 F. Supp 2d
7    896 (N.D. Ill, 2010); and Soto vs. U.S.A., 2011 U.S. Dist. LEXIS
8    9186 (D.C. NJ, 2011)

9        In the instant matter, Hirschmann never informed Arash of
10   the actual immigration consequences although he allegedly
11   conferred with an immigration attorney. It is very difficult to
12   believe that an experienced immigration attorney would not have
13   advised Mr. Hirschmann of the drastic consequences regarding
14   immigration status and naturalization that would surely result
15   from the proposed plea and sentence in this case. In any even
16   Hirschmann did not provide this information to Golshani and,
17   pursuant to Padilla, his failure to do so was prejudicial and
18   the plea should be vacated or at least the sentence modified as
19   specified above.

20
21   Date: August 11, 2011            Respectfully submitted,
22
23
24   ARTHUR AVAZIAN
25   ATTORNEY FOR DEFENDANT
     ARASH AZIZ-GOLSHANI
26
27
28

# DECLARATION OF DAVID L. ROSS

1.  I am a licensed attorney in the State of Florida, admitted to the United States Supreme Court, Fifth, Ninth, and Eleventh Circuit Courts of Appeal, and the District Courts of the Northern District of California, Colorado, and various other courts. I have been practicing immigration law since 1982 and I have several published decisions in this area, including one directly related to the instant matter, United States of America vs. Kwok Chee Kwan, 407 F.3d 1005 (9th Cir.2005).

2.  This Declaration is based upon my personal knowledge, and information and belief which includes a review of the criminal file, legal research, and interviews with Petitioner. If called as a witness and placed under oath, I could and would testify as stated below.

3.  In 2010, I had occasion to meet with the Petitioner ARASH AZIZ-GOLSHANI ("ARASH") concerning his conviction of March 5, 2000, to which ARASH pled guilty to 18 U.S.C. 371 and 15 U.S.C. 78j, and was sentenced to a term of Fifteen (15) months incarceration and ordered to pay restitution in the amount of $566,000.  Because of the crime and sentence ARASH was found to be an aggravated felon in accordance with 8 U.S.C. 1101(a)(43) and precluded from ever again becoming a permanent resident of the United States.  Pursuant to 8 U.S.C. 1101(a)(43)(M)(I), any alien convicted of a crime of fraud wherein the loss to the victim is found to be by the criminal court in excess of $10,000 is deemed to have committed an aggravated felony.  Furthermore, under 8 U.S.C. 1101(a)(43)(G) a sentence of One (1) year or more is deemed an aggravated felony where the underlying crime involves theft, irrespective of actual time served.  Generally, fraud is also deemed a theft offense.  In accordance with 8 U.S.C. 1227(a)(2)(A)(iii), legal permanent residents who are convicted of an aggravated felony are

subject to permanent removal and are barred for life from living in the United States as residents. There is no waiver under section 212(h) of the Immigration and Nationality for permanent residents even though aliens who were never permanent residents are eligible for the waiver of removal. This law has been in effect since September 30, 1996, when the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") was enacted. During the entire criminal proceedings ARASH was a permanent resident of the United States, and as such, when deemed an aggravated felon, is ineligible for a Section 212(h) waiver and permanently removable and barred from living in The United States for life as a resident.

4.   Although ARASH was granted withholding of removal from Iran by the Immigration Court, withholding does not entail the granting of any status and one with withholding can not travel. Withholding is relief from removal whereby Immigration and Customs Enforcement suspends removal because of the clear probability of persecution of returning to one's home country which in this case was Iran. ARASH had wanted to know if there was a possibility of obtaining permanent residency. I explained to him that the possibility of residency was predicated upon post-conviction relief. He asked me to investigate this avenue.

5.   I spoke to ARASH's former criminal attorney RALPH F. HIRSCHMANN ("HIRSCHMANN") of Los Angeles, California, and the attorney who had handled ARASH's criminal case from indictment to sentencing. HIRSCHMANN provided me with his case files and notes and I had an opportunity to review the entire contents of the criminal matter with an eye towards determining if ARASH could obtain post conviction relief sufficient for immigration purposes. After reviewing the files and notes I spoke with HIRSCHMANN several times about his recollection of the case and the reason for the plea agreement. I ascertained the following information:

A.  HIRSCHMANN did not have any background in immigration law and relied on a single generic conversation with an immigration attorney prior to the plea agreement wherein the attorney purportedly told HIRSCHMANN everything would be fine.  I was later contacted by this attorney at the request of ARASH's present counsel and had an opportunity to review with him his pattern and practice regarding dispensation of such information in the context of HIRSCHMANN's conversation with him.  I learned that the conversation between him and HIRSCHMANN was brief, general in nature, and non-specific as to the charges in this case.  I further learned that no assurances that everything would be fine was ever given as this would be contrary to his pattern and practice of answering general inquiries.  Rather, the attorney explained the crime would be an aggravated felony and that withholding would be a potential form of relief.

B.  ARASH had not been apprised of the specific immigration consequences of his plea and instead understood from HIRSCHMANN that there would ne no permanent adverse immigration consequences.  Furthermore, at the plea hearing as the transcript shows, ARASH was never advised by the Court of any possibility of adverse immigration consequences as a result of his plea.

C.  ARASH had several defenses to the charges including the absence of any apparent audible audio tapes notwithstanding a transcript of the purported conversation, lack of credibility of his purported co-conspirator, and assertion of first amendment rights.

D.  During the plea negotiations HIRSCHMANN never argued nor attempted to substitute the SEC's soon to be obtained civil judgment in lieu of restitution being ordered by the Court.  HIRSCHMANN also never attempted to set the amount of restitution to a maximum of $10,000 or less even though the Assistant United States Attorney never demanded a specific

amount to be paid, and the SEC had indicated it would be obtaining a civil judgment for the

amount it believed represented loss to the victims.

      E. HIRSCHMANN made no attempt to negotiate a plea with the AUSA wherein

a sentence of less than One (1) year would be imposed and restitution would be separate from the

underlying charge by way of a civil settlement thereby precluding a finding that the conviction

was an aggravated felony. HIRSCHMANN did not attempt during the Pre-Sentencing process to

discuss restitution with the officer preparing the Pre-Sentencing Report nor did he file any brief

or statement in support of a civil judgment in lieu of restitution being assessed. At the sentencing

hearing HIRSCHMANN never requested the Court to consider abstaining from assessing

restitution in light of the SEC's stated intent at the time to obtain a civil judgment for any losses

suffered., nor did he object to the restitution amount.

      F. HIRSCHMANN never filed a single motion in the case and did not argue in

writing any possible defenses in an attempt to reduce the sentence and remove restitution from

the criminal matter and place it solely in the civil arena which the SEC did anyway by way of a

civil judgment.

    6. I was aware that Padilla v. Kentucky, 130 S. Ct. 1473 (2010), was pending in the

United States Supreme Court and my advice to ARASH was to wait until Padilla was decided

unless he was sure he could make out a clear case that his trial counsel had affirmatively

misinformed him of the immigration consequences. As a follow up to my research, I spoke with

Padilla's lawyers and counsel for the Govt, after oral argument had taken place before the

Supreme Court. Each side offered me divergent views and possible scenarios. I told ARASH

after talking with both sides in Padilla that I believed at the very minimum Padilla would

enhance Kwan and could more than likely extend it.

7.   After <u>Padilla</u> was decided by the United States Supreme Court, I informed ARASH of the holding and told him that in my opinion it was favorable to him, especially because of the prejudice that he suffered as a result of his attorney not notifying him of the immigration consequences and not utilizing any of the defenses in his case.  I also informed ARASH that even under <u>United States of America vs. Kwok Chee Kwan</u>, 407 F.3d 1005 (9th Cir. 2005), HIRSCHMANN's actions and omissions could be viewed as affirmative misconduct uder the <u>Strickland</u> standard.

8.   The United States Supreme Court, in <u>Padilla</u>  decided that a criminal attorney had the affirmative duty to inform his client of the immigration consequences before making a plea. The Court concluded that if the non-citizen had any reasonable defense and waived that defense by pleading without being informed of the immigration consequences, the failure by the attorney was prejudicial and the plea should be vacated.

9.   As to the question of whether or not <u>Padilla</u> applies retroactively, the Supreme Court has not yet spoken although the general consensus of the Justices is that the power of a coram nobus emanates from the All Writs Act, 28 U.S.C. 1651(a) and that applying this form of relief accordingly is the norm.  See <u>U.S. v. Denedo</u>, 129 S. Ct. 2213, 173 L. Ed. 2d 1235 (2009). While there has been a divergence of opinion on the issue of the applicability of <u>Padilla</u> retroactively, several district courts including those in the Southern and Central Districts of California have held that it applies retroactively.  Of particular note is <u>U.S. v. Diaz-Palmerin</u>, 2011 U.S. Dist. LEXIS 37151 (E.D. Ill, 2011), and <u>U.S. v. Chaidez</u>, 730 F. Supp 2d 896 (N.D. Ill, 2010) which contain extensive and reasoned opinions that <u>Padilla</u> merely extends the <u>Strickland</u> holding and is not a new rule.  Additionally, the court in <u>Soto v. U.S.A.</u>, 2011 U.S. Dist. LEXIS 9186 (D.C. NJ, 2011) ruled that preclusion of immigration benefits is an adverse

consequence under <u>Padilla</u>.  <u>Soto</u> also dealt with the issue of not filing a coram nobus for over

nine (9) years until after <u>Padilla</u>.  The court held that filing post <u>Padilla</u> is excusable delay and

does not preclude the granting of a coram nobus.


DATED: July ____, 2011                         _____
                                               DAVID L. ROSS

COPY

COPY

1  ALEJANDRO N. MAYORKAS
   United States Attorney
2  GEORGE S. CARDONA
   Assistant United States Attorney
3  Chief, Criminal Division
   MANUEL A. ABASCAL (CA # 171301)
4  CHRISTOPHER M.E. PAINTER, (CA # 154034)
   Assistant United States Attorney
5        1100 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone:  (213) 894-6682/0358
7
   Attorneys for Plaintiff
8  UNITED STATES OF AMERICA

FILED
2000 MAR -1 PM 3:34
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES

9            UNITED STATES DISTRICT COURT

10       FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  UNITED STATES OF AMERICA,        )    No. CR 00-07-GAF
                                     )
12              Plaintiff,           )    PLEA AGREEMENT FOR DEFENDANT
                                     )    ARASH AZIZ-GOLSHANI
13         v.                        )
                                     )    [UNDER SEAL]
14  ARASH AZIZ-GOLSHANI,             )
                                     )
15              Defendant.           )
    _____)

16

17       1.   This constitutes the plea agreement between ARASH AZIZ-

18  GOLSHANI ("defendant") and the United States Attorney's Office

19  for the Central District of California ("the USAO") in the above-

20  captioned case.  This agreement is limited to the USAO and cannot

21  bind any other federal, state or local prosecuting,

22  administrative or regulatory authorities.

23                           PLEA

24       2.   Defendant agrees to plead guilty to counts one and two

25  of the indictment in United States v. Arash Aziz-Golshani and

26  Hootan Melamed, No. CR 00-7-GAF.

27

28

## NATURE OF THE OFFENSE

3.   In order for defendant to be guilty of count one, which charges a violation of Title 18, United States Code, Section 371 (conspiracy), the following must be true:  first, there was an agreement between defendant and at least one other person to commit a criminal act, in this case, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff ("securities fraud"); second, defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it; and third, one of the members of the conspiracy committed at least one overt act for purposes of carrying out the conspiracy.  In order for defendant to be guilty of count two, which charges a violation of 15 U.S.C. §§ 78j(b) & 77ff, the following must be true: first, defendant used a device or scheme to defraud someone or made an untrue statement of material fact, or failed to disclose a material fact which resulted in making defendant's statements misleading; second, defendant's conduct was in connection with the purchase or sale of a security; third, defendant used the means of interstate commerce or the facilities of a national exchange in connection with his acts or failure to disclose; and fourth, defendant acted for the purpose of defrauding buyers or sellers of securities. Defendant admits that he is, in fact, guilty of these offenses as described in counts one and two of the indictment.

## PENALTIES AND RESTITUTION

4.   The statutory maximum sentence that the Court can

2

1    impose for a violation of Title 18, United States Code, Section
2    371 is 5 years of imprisonment; a three-year period of supervised
3    release; a fine of $250,000 or twice the gross gain or gross loss
4    resulting from the offense, whichever is greatest; and a
5    mandatory special assessment of $100.  The statutory maximum
6    sentence that the Court can impose for a violation of Title 15,
7    United States Code, Sections 78j(b) and 78ff is 10 years of
8    imprisonment; a three-year period of supervised release; a fine
9    of $1,000,000 or twice the gross gain or gross loss resulting
10   from the offense, whichever is greatest; and a mandatory special
11   assessment of $100.  Therefore, the total maximum sentence the
12   court could impose is 15 years of imprisonment; a fine of
13   $1,250,000 or twice the gross gain or gross loss resulting from
14   the offense, whichever is greatest; a three-year period of
15   supervised release; and a mandatory special assessment of $200.
16       5.   Defendant understands that pursuant to 18 U.S.C.
17   § 3663A the court shall order that defendant pay restitution to
18   the victims of the offenses.  Defendant agrees that, in return
19   for the USAO's compliance with its obligations under this
20   agreement, the amount of restitution is not restricted to the
21   amounts alleged in the counts to which defendant is pleading
22   guilty and may include losses arising from counts dismissed and
23   charges not prosecuted pursuant to this agreement as well as all
24   relevant conduct in connection with those counts and charges.
25   Specifically, defendant agrees to pay restitution for defendant's
26   fraudulent scheme to manipulate the price of the following stocks

27

28                                    3

through, among other things, disseminating false reports about the stocks through the Internet:  NEI Web World, EtwoMedia, WorldTradeShow.com, Big Daddy Barbecue Racing Company, Alpha One Biomedical Inc., 1twoe Com., Inc., Casino Pirata.com, Inc. (CSIN), Imperial Ginseng Products Limited, Teleworld, Classified OnLine, Encounter.com, Virtual Games, Food vision, JustWebIt, YouTicket, Fashionmall, and Ichargeit.  Defendant further agrees that defendant will not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.  Defendant understands that the court will follow the procedures specified in 18 U.S.C. §§ 3663A & 3664, and the parties reserve their rights under those sections.

6.   Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

<u>FACTUAL BASIS</u>

7.   Defendant and the USAO agree and stipulate to the statement of facts attached hereto.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

8.   By pleading guilty, defendant gives up the following rights:

4

1            a)    The right to persist in a plea of not guilty.

2            b)    The right to a speedy and public trial by jury.

3            c)    The right to the assistance of counsel at trial,

4 including, if defendant could not afford an attorney, the right

5 to have the Court appoint one for defendant.

6            d)    The right to be presumed innocent and to have the

7 burden of proof placed on the government to prove defendant

8 guilty beyond a reasonable doubt.

9            e)    The right to confront and cross-examine witnesses

10 against defendant.

11            f)    The right, if defendant wished, to testify on

12 defendant's own behalf and present evidence in opposition to the

13 charges, including the right to call witnesses and to subpoena

14 those witnesses to testify.

15            g)    The right not to be compelled to testify, and, if

16 defendant chose not to testify or present evidence, to have that

17 choice not be used against defendant.

18      By pleading guilty, defendant also gives up any and all

19 rights to pursue any affirmative defenses, Fourth Amendment or

20 Fifth Amendment claims, and other pretrial motions that have been

21 filed or could be filed.

22                      <u>SENTENCING FACTORS</u>

23      9.   Defendant understands that the Court is required to

24 consider and apply the United States Sentencing Guidelines

25 ("U.S.S.G." or "Sentencing Guidelines") but may depart from those

26 guidelines under some circumstances.

27

28                         5

1        10.  Defendant and the USAO agree and stipulate to the

2   following applicable sentencing guideline factors:

3        Base Offense Level  :     <u>6</u>      [U.S.S.G. § 2F1.1(a)]

4        Specific Offense
         Characteristics

5        (Loss)              :     <u>9</u>      [U.S.S.G. § 2F1.1(b)(1)]

6
7        (More than minimal
         planning)           :     <u>2</u>      [U.S.S.G. § 2F1.1(b)(2)]

8   Defendant and the USAO agree that loss for purposes of U.S.S.G.

9   § 2F1.1(b)(1) is limited to defendant's gains in the purchase and

10  sale of stock in NEI Web World, EtwoMedia, WorldTradeShow.com,

11  Big Daddy Barbecue Racing Company, Alpha One Biomedical Inc.,

12  1twoe Com., Inc., Teleworld, Casino Pirata.com, Inc. (CSIN),

13  Imperial Ginseng Products Limited, Classified OnLine,

14  Encounter.com, Virtual Games, Food vision, JustWebIt, YouTicket,

15  Fashionmall, and Ichargeit.  Defendant agrees that this

16  calculation does not limit defendant's obligation to make

17  restitution to the victims of his offense based on the losses

18  suffered by those victims, rather than the gains received by

19  defendant.  Defendant and the government agree that no other

20  specific offense characteristics, adjustments, or departures

21  apply, except (a) for those described in paragraph 16 below, and

22  (b) the government reserves its right to request that the court

23  increase defendant's offense level by 2 pursuant to U.S.S.G.

24  § 3B1.1.  The parties agree to abide by this stipulation in court

25  and with the Probation Office.

26        11.  There is no agreement as to defendant's criminal

27

28                                  6

1  history or criminal history category.

2      12.  The stipulations in this agreement do not bind either

3  the United States Probation Office or the Court.  The  Court will

4  determine the facts and calculations relevant to sentencing.

5  Both defendant and the USAO are free to: (a) supplement the facts

6  stipulated to in this agreement by supplying relevant information

7  to the United States Probation Office and the Court, (b) correct

8  any and all factual misstatements in the Pre-Sentence Reports

9  relating to the calculation of the sentence, and (c) argue on

10 appeal and collateral review that the Court's sentencing

11 calculations are not error, although each party agrees to

12 maintain its view that the calculations in paragraph 10 are

13 consistent with the facts of this case.

14                    DEFENDANT'S OBLIGATIONS

15      13.  Defendant agrees:

16          a)   To plead guilty as set forth in this agreement.

17          b)   Not knowingly and willfully to fail to abide by

18 all sentencing stipulations contained in this agreement.

19          c)   Not knowingly and willfully to fail to: (i) appear

20 as ordered for all court appearances, (ii) surrender as ordered

21 for service of sentence, (iii) obey all conditions of any bond,

22 and (iv) obey any other ongoing court order in this matter.

23          d)   Not to commit any crime;

24          e)   Not knowingly and willfully to fail to be truthful

25 at all times with Pretrial Services, the U.S. Probation Office,

26 and the Court.

27

28                              7

1   f)   To pay the applicable special assessments at or

2   before the time of sentencing unless defendant lacks the ability

3   to pay.

4   14.   Defendant further agrees to cooperate fully with the

5   USAO, the FBI, and as directed by the USAO, with any other

6   federal, state, or local law enforcement agency.   This

7   cooperation requires defendant to:

8        a)   Respond truthfully and completely to all questions

9   that may be put to defendant, whether in interviews, before a

10  grand jury, or at any trial or other court proceeding.

11       b)   Attend all meetings, grand jury sessions, trials

12  or other proceedings at which defendant's presence is requested

13  by the USAO or compelled by subpoena or court order.

14       c)   Produce voluntarily all documents, records, or

15  other tangible evidence relating to matters about which the USAO,

16  or its designee, inquires.

17       d)   Act, if requested to do so, in an undercover

18  capacity to the best of defendant's ability in connection with

19  criminal investigations by federal, state, or local law

20  enforcement authorities, in accordance with the instructions of

21  those law enforcement authorities.   Defendant agrees not to act

22  undercover, tape record any conversations, or gather any evidence

23  unless expressly instructed or authorized to do so by federal,

24  state, or local law enforcement authorities.

25  15.   Defendant further agrees:

26       a)   To disclose to law enforcement officials, at a

27

28                                    8

1  date and time to be set by the USAO, the whereabouts of,

2  defendant's ownership interest in, and all other information

3  known to defendant about, all monies, property or assets of any

4  kind, derived from or acquired as a result of, or used to

5  facilitate the commission of, defendant's illegal activities.

6         b)   To fill out and deliver to the USAO a completed

7  and truthful financial statement (Form OBD-500) listing

8  defendant's assets.

9                    THE USAO'S OBLIGATIONS

10     16.  If defendant complies fully with all defendant's

11  obligations under this agreement, the USAO agrees:

12         a)   To abide by all sentencing stipulations contained

13  in this agreement.

14         b)   At the time of sentencing, provided that defendant

15  demonstrates an acceptance of responsibility for the offenses up

16  to and including the time of sentencing, to recommend a two-level

17  reduction in the applicable sentencing guideline offense level,

18  pursuant to U.S.S.G. § 3E1.1, and an additional one-level

19  reduction if available under that section.

20         c)   Except for criminal tax violations (including

21  conspiracy to commit such violations chargeable under 18 U.S.C.

22  § 371), not further to prosecute defendant for violations of 18

23  U.S.C. § 371, 15 U.S.C. § 78j(b) and 78ff, or 18 U.S.C. §§ 1341,

24  1343, arising out of defendant's participation in any conspiracy

25  to manipulate or his manipulation of the price of the following

26  stocks:  NEI Web World, EtwoMedia, WorldTradeShow.com, Big Daddy

27

28                              9

Barbecue Racing Company, Alpha One Biomedical Inc., 1twoe Com.,
Inc., Casino Pirata.com, Inc. (CSIN), Teleworld, Imperial Ginseng
Products Limited, Classified OnLine, Encounter.com, Virtual
Games, Food vision, JustWebIt, YouTicket, Fashionmall, and
Ichargeit.  Defendant understands that the USAO is free to
prosecute defendant for any other unlawful past conduct or any
unlawful conduct that occurs after the date of this agreement.
Defendant agrees that at the time of sentencing the Court may
consider the uncharged conduct in determining the applicable
Sentencing Guidelines range, where the sentence should fall
within that range, and the propriety and extent of any departure
from that range.

       d)   Not to offer as evidence in its case-in-chief in
the above-captioned case or any other prosecution that may be
brought against defendant by the USAO, or in connection with any
sentencing proceeding in any case that may be brought against
defendant by the USAO, any statements made by defendant or
tangible evidence provided by defendant pursuant to this
agreement.  Defendant agrees, however, that the USAO may use such
statements and tangible evidence: (1) to obtain and pursue leads
to other evidence, which evidence may be used for any purpose,
including any prosecution of defendant, (2) to cross-examine
defendant should defendant testify, or to rebut any evidence,
argument or representations made by defendant or a witness called
by defendant in any trial, sentencing hearing, or other court
proceeding, and (3) in any prosecution of defendant for false

                            10

statement, obstruction of justice, or perjury.

e)   Not to use any information provided by defendant pursuant to this agreement against defendant with the Probation Office or the Court at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, and to recommend to the Court and the Probation Office that such information not be used in determining the point in the Sentencing Guidelines range at which defendant should be sentenced. Defendant understands, however, that information provided by defendant pursuant to this agreement will be disclosed to the Probation Office and the Court, and that the Court may use this information for the purposes set forth in U.S.S.G § 1B1.8(b).

f)   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

g)   If the USAO determines, in its exclusive judgment, that defendant has provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to impose a sentence below the sentencing range otherwise dictated by the sentencing guideline.

DEFENDANT'S UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE

17.   Defendant understands the following:

a)   Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false

11

1  statement, obstruction of justice, and perjury and will

2  constitute a breach by defendant of this agreement.

3         b)    Nothing in this agreement requires the USAO or any

4  other prosecuting or law enforcement agency to accept any

5  cooperation or assistance that defendant may offer, or to use it

6  in any particular way.

7         c)    Defendant cannot withdraw defendant's guilty pleas

8  if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1

9  for a reduced sentence or if the USAO makes such a motion and the

10  Court does not grant it.

11         d)    At this time the USAO makes no agreement or

12  representation as to whether any cooperation that defendant has

13  provided or intends to provide constitutes substantial

14  assistance.  The decision whether defendant has provided

15  substantial assistance rests solely within the discretion of the

16  USAO.

17         e)    The USAO's determination of whether defendant has

18  provided substantial assistance will not depend in any way on

19  whether the government prevails at any trial or court hearing in

20  which defendant testifies.

21                        BREAK OF AGREEMENT

22     18.  If defendant, at anytime between the execution of this

23  agreement and the completion of defendant's cooperation pursuant

24  to this agreement or defendant's sentencing on a non-custodial

25  sentence or surrender for service of a custodial sentence,

26  whichever is later, knowingly violates or fails to perform any of

27

28                              12

1 defendant's obligations under this agreement ("a breach"), the

2 USAO may declare this agreement breached.  If the USAO declares

3 the agreement breached, and the Court finds such a breach to have

4 occurred, defendant will not be able to withdraw defendant's

5 guilty pleas, and the USAO will be relieved of all its

6 obligations under this agreement.  In particular:

7      a)   The USAO will no longer be bound by any agreements

8 concerning sentencing and will be free to seek any sentence up to

9 the statutory maximum for the crimes to which defendant has

10 pleaded guilty.

11      b)   The USAO will no longer be bound by any agreements

12 regarding criminal prosecution, and will be free to prosecute

13 defendant for any crime, including charges that the USAO would

14 otherwise have been obligated not to prosecute pursuant to this

15 agreement.

16      c)   The USAO will be free to prosecute defendant for

17 false statement, obstruction of justice, and perjury based on any

18 knowingly false or misleading statement by defendant.

19      d)   The USAO will no longer be bound by any agreement

20 regarding the use of statements, tangible evidence, or

21 information provided by defendant, and will be free to use any of

22 those in any way in any investigation, prosecution, or civil or

23 administrative action.  Defendant will not be able to assert

24 either (1) that those statements, tangible evidence, or

25 information were obtained in violation of the Fifth Amendment

26 privilege against compelled self-incrimination, or (2) any claim

27

28                     13

1  under the United States Constitution, any statute, Rule 11(e)(6)

2  of the Federal Rules of Criminal Procedure, Rule 410 of the

3  Federal Rules of Evidence, or any other federal rule, that

4  statements, tangible evidence, or information provided by

5  defendant before or after the signing of this agreement, or any

6  leads derived therefrom, should be inadmissible.

7       19.  Following a knowing and willful breach of this

8  agreement by defendant, should the USAO elect to pursue any

9  charge that was not filed as a result of this agreement, then:

10           a)   Defendant agrees that any applicable statute of

11 limitations is tolled between the date of defendant's signing of

12 this agreement and the USAO's discovery of any knowing and

13 willful breach by defendant.

14           b)   Defendant gives up all defenses based on the

15 statute of limitations, any claim of preindictment delay, or any

16 speedy trial claim with respect to any such prosecution except to

17 the extent that such defenses existed as of the date of

18 defendant's signing of this agreement.

19           LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

20      20.  Defendant gives up the right to appeal any sentence

21 imposed by the Court, including any order of restitution, and the

22 manner in which the sentence is determined, provided that (a) the

23 sentence is within the statutory maximum specified above and is

24 constitutional, (b) the Court does not depart upward in offense

25 level or criminal history category, and (c) the Court determines

26 that the total offense level is 16 or below and imposes a

27

28                              14

1 | sentence within the range corresponding to the determined total
2 | offense level. Defendant also gives up any right to bring a
3 | post-conviction attack on the convictions or sentence, including
4 | any order of restitution, except a post-conviction attack based
5 | on a claim of ineffective assistance of counsel, a claim of newly
6 | discovered evidence, or an explicitly retroactive change in the
7 | applicable Sentencing Guidelines, sentencing statutes, or
8 | statutes of conviction.

9 |     21. The USAO gives up its right to appeal the Court's
10 | Sentencing Guidelines calculations, provided that (a) the Court
11 | does not depart downward in offense level or criminal history
12 | category (except by a downward departure in offense level
13 | pursuant to, and to the extent requested by, the USAO in a motion
14 | under U.S.S.G. § 5K1.1) and (b) the Court determines that the
15 | total offense level is 16 or above prior to any departure under
16 | U.S.S.G. § 5K1.1.

17 | RESULT OF VACATUR, REVERSAL OR SET-ASIDE

18 |     22. Defendant agrees that if any count of conviction is
19 | vacated, reversed, or set aside, the USAO may: (a) ask the Court
20 | to resentence defendant on any remaining count of conviction,
21 | with both the USAO and defendant being released from any
22 | stipulations regarding sentencing contained in this agreement,
23 | (b) ask the Court to void the entire plea agreement and vacate
24 | defendant's guilty plea on any remaining count of conviction,
25 | with both the USAO and defendant being released from all of their
26 | obligations under this agreement, or (c) leave defendant's

27 |

28 | 15

1  remaining conviction, sentence, and plea agreement intact.

2  Defendant agrees that the choice among these three options rests

3  in the exclusive discretion of the USAO.

SCOPE OF AGREEMENT

5      23.  The Court is not a party to this agreement and need not

6  accept any of the USAO's sentencing recommendations or the

7  parties' stipulations.  Even if the Court ignores any sentencing

8  recommendation, finds facts or reaches conclusions different from

9  any stipulation, and/or imposes any sentence up to the maximum

10 established by statute, defendant cannot, for that reason,

11 withdraw defendant's guilty pleas, and defendant will remain

12 bound to fulfill all defendant's obligations under this

13 agreement.  No one -- not the prosecutor, defendant's attorney,

14 or the Court -- can make a binding prediction or promise

15 regarding the sentence defendant will receive, except that it

16 will be within the statutory maximum.

17     24.  This agreement applies only to crimes committed by

18 defendant, has no effect on any proceedings against defendant not

19 expressly mentioned herein, and shall not preclude any past,

20 present, or future forfeiture actions.

NO ADDITIONAL AGREEMENTS

22     25.  Except as set forth herein, there are no promises,

23 understandings or agreements between the USAO and defendant or

24 defendant's counsel.  Nor may any additional agreement,

25 understanding or condition be entered into unless in a writing

26 signed by all parties or on the record in court.

16

1    This agreement is effective upon signature by defendant and

2  an Assistant United States Attorney.

3  AGREED AND ACCEPTED

4  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA

5
   ALEJANDRO N. MAYORKAS
6  United States Attorney

7

8  _____          2/28/00
   MANUEL A. ABASCAL                 Date
9  Assistant United States Attorney

10 _____          2/29/06
11 CHRISTOPHER M. E. PAINTER         Date
   Assistant United States Attorney

12

13    I have read this agreement and carefully discussed every

14 part of it with my attorney.  I understand the terms of this

15 agreement, and I voluntarily agree to those terms.  My attorney

16 has advised me of my rights, of possible defenses, of the

17 Sentencing Guideline provisions, and of the consequences of

18 entering into this agreement.  No promises or inducements have

19 been made to me other than those contained in this agreement.  No

20 one has threatened or forced me in any way to enter into this

21 agreement.  Finally, I am satisfied with the representation of my

22 attorney in this matter.

23

24 _____          _____
   ARASH AZIZ-GOLSHANI               Date
25 Defendant

26    I am Arash Aziz-Golshani's attorney.  I have carefully

27

28                        17

1    This agreement is effective upon signature by defendant and

2  an Assistant United States Attorney.

3  AGREED AND ACCEPTED

4  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA

5
   ALEJANDRO N. MAYORKAS
6  United States Attorney

7

8  _____        _____
   MANUEL A. ABASCAL                 Date
9  Assistant United States Attorney

10

11 _____        _____
   CHRISTOPHER M. E. PAINTER         Date
12 Assistant United States Attorney

13    I have read this agreement and carefully discussed every

14 part of it with my attorney.  I understand the terms of this

15 agreement, and I voluntarily agree to those terms.  My attorney

16 has advised me of my rights, of possible defenses, of the

17 Sentencing Guideline provisions, and of the consequences of

18 entering into this agreement.  No promises or inducements have

19 been made to me other than those contained in this agreement.  No

20 one has threatened or forced me in any way to enter into this

21 agreement.  Finally, I am satisfied with the representation of my

22 attorney in this matter.

23

24 _____        2/28/00
   ARASH AZIZ-GOLSHANI               Date
25 Defendant

26    I am Arash Aziz-Golshani's attorney.  I have carefully

27

28                              17

1  discussed every part of this agreement with my client.  Further,

2  I have fully advised my client of his rights, of possible

3  defenses, of the Sentencing Guideline provisions, and of the

4  consequences of entering into this agreement.  To my knowledge,

5  my client's decision to enter into this agreement is an informed

6  and voluntary one.

7

8  RALPH HIRSCHMANN                    Date  2/28/00
   Counsel for Defendant
9  ARASH AZIZ-GOLSHANI

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    18

1

## STATEMENT OF FACTS

2   Beginning on a date unknown and continuing to on or about

3   December 15, 1999, in the Central District of California and

4   elsewhere, defendant, co-defendant Hootan Melamed, and others,

5   knowingly combined, conspired and agreed to violate Title 15,

6   United States Code, Sections 78j(b) and 77ff and Rule 10b-5 of

7   the Rules and Regulations of the United States Securities and

8   Exchange Commission, knowingly and willfully, and with the intent

9   to defraud by (1) engaging in a scheme to defraud and (2) making

10  an untrue statement of a material fact, and omitting to state a

11  material fact necessary to make the statement, in light of the

12  circumstances under which it was made, not misleading, in

13  connection with the purchase or sale of securities, and using any

14  means and instrumentalities of interstate commerce.

15  Defendant became a member of the conspiracy knowing of its

16  object to violate the securities laws and intending to help

17  accomplish that object.  The conspiracy and scheme to defraud

18  operated, in part, as follows:

19  Defendant, Melamed, and others purchased, and caused others

20  to purchase, large numbers of shares of NEI stock at a low price.

21  Defendant, Melamed, and others created and obtained numerous

22  "screen names" to be used on Internet bulletin board services

23  including Yahoo! Finance, Raging Bull and FreeRealTime.   A

24  "screen name" is a name that is obtained from an Internet service

25  provider and used to communicate and receive messages on the

26  Internet.   False and fictitious identifying information was used

27

28                          19

1  when obtaining these "screen names."

2       In order to manipulate the price of NEI stock, specifically

3  to induce other investors to purchase shares of NEI stock and to

4  inflate the price of NEI stock, defendant Melamed, and others

5  acting at his direction used the various screen names to post

6  messages promoting NEI on hundreds of Internet bulletin boards,

7  including those of Yahoo! Finance, Raging Bull, and FreeRealTime.

8       The messages defendant, Melamed, and his coconspirators

9  posted and caused to be posted contained untrue statements of

10  material facts, and omitted to state material facts necessary to

11  make the messages not misleading, in that:   (1) the messages

12  claimed that the price of NEI would increase dramatically because

13  of an upcoming merger, when in truth and fact, as defendant,

14  Melamed, and their co-conspirators then knew, there was no such

15  merger; and (2) the messages were sent under numerous screen

16  names thereby creating the false and misleading impression that

17  many different people thought the NEI stock would rise, when in

18  truth and fact, as defendant, Melamed, and their co-conspirators

19  then knew, the messages were prepared and sent by defendant,

20  Melamed, and other coconspirators.

21       As a result of the false messages posted by defendant,

22  Melamed, and his coconspirators, the price of NEI stock

23  substantially increased.   Thereafter, defendant, Melamed, and his

24  coconspirators sold their NEI stock at the artificially inflated

25  prices.   When the price of NEI stock subsequently collapsed,

26  other individuals who had bought at the artificially inflated

27

28                              20

1  prices lost substantial amounts of money.

2      In furtherance of the conspiracy and to carry out the

3  objects thereof, defendant committed and caused the commission of

4  numerous overt acts within the Central District of California and

5  elsewhere, including the following, among others:

6          a.   On or about November 10, 1999, defendant

7  purchased, and caused to be purchased, 10,000 shares of NEI at a

8  price of 9 cents per share, using his WebStreet account.

9          b.   On or about November 12, 1999, defendant

10 purchased, and caused to be purchased, 20,000 shares of NEI at a

11 price of 13 cents per share, using his WebStreet account.

12         c.   On or about November 14, 1999, defendant met with

13 co-conspirators at the UCLA Biomed Library.  Defendant used, and

14 instructed others to use, the computers at the UCLA Biomed

15 Library to create numerous Internet screen names to be used as

16 aliases.

17         d.   On or about November 14, 1999, defendant met with

18 his co-conspirators at the Biomed Library, and instructed these

19 people to use the alias screen names to post on numerous Internet

20 bulletin boards devoted to the exchange of information of various

21 stocks false messages claiming that NEI would be purchased by LGC

22 Wireless.

23         e.   On or about November 15, 1999, defendant sold his

24 stock in NEI realizing a profit of $151,375.

25     On or about November 15, 1999, defendant knowingly and

26 willfully and with intent to defraud, directly and indirectly and

27

28                            21

1  using any means and instrumentality of commerce, employed the

2  scheme to defraud described above, and made the untrue statements

3  of material facts described above, in connection with the sale of

4  10,000 shares of NEI at $7.56 per share.

<u>CERTIFICATE OF SERVICE BY MAIL</u>

I, **CRISTINA L. WILSON**, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on **March 1, 2000**, I deposited in the U.S. Mail at 312 N. Spring Street, Los Angeles, California, 90012, in the above-entitled action, in an envelope earing the requisite postage, a copy of:

**PLEA AGREEMENT FOR DEFENDANT ARASH AZIZ-GOLSHANI**
**[UNDER SEAL]**

addressed to:

**RALPH F. HIRSCHMANN, ESQ.**
**707 WILSHIRE BOULEVARD, STE 4910**
**LOS ANGELES, CA 90017**

at <u>his</u> last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on **March 1, 2000**, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

CRISTINA L. WILSON

1  ALEJANDRO N. MAYORKAS
   United States Attorney
2  GEORGE S. CARDONA
   Assistant United States Attorney
3  Chief, Criminal Division
   MANUEL A. ABASCAL (CA # 171301)
4  CHRISTOPHER M.E. PAINTER, (CA # 154034)
   Assistant United States Attorney
5        1100 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone:  (213) 894-6682/0358
7
   Attorneys for Plaintiff
8  UNITED STATES OF AMERICA

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11 UNITED STATES OF AMERICA,    )    No. CR 00-07-GAF
                                )
12              Plaintiff,      )    PLEA AGREEMENT FOR DEFENDANT
                                )    ARASH AZIZ-GOLSHANI
13              v.              )
                                )    [UNDER SEAL]
14 ARASH AZIZ-GOLSHANI,         )
                                )
15              Defendant.      )
   _____)

16

17      1.   This constitutes the plea agreement between ARASH AZIZ-

18 GOLSHANI ("defendant") and the United States Attorney's Office

19 for the Central District of California ("the USAO") in the above-

20 captioned case.  This agreement is limited to the USAO and cannot

21 bind any other federal, state or local prosecuting,

22 administrative or regulatory authorities.

23                           PLEA

24      2.   Defendant agrees to plead guilty to counts one and two

25 of the indictment in United States v. Arash Aziz-Golshani and

26 Hootan Melamed, No. CR 00-7-GAF.

27

28

## NATURE OF THE OFFENSE

3.    In order for defendant to be guilty of count one, which charges a violation of Title 18, United States Code, Section 371 (conspiracy), the following must be true:  first, there was an agreement between defendant and at least one other person to commit a criminal act, in this case, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff ("securities fraud"); second, defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it; and third, one of the members of the conspiracy committed at least one overt act for purposes of carrying out the conspiracy.  In order for defendant to be guilty of count two, which charges a violation of 15 U.S.C. §§ 78j(b) & 77ff, the following must be true: first, defendant used a device or scheme to defraud someone or made an untrue statement of material fact, or failed to disclose a material fact which resulted in making defendant's statements misleading; second, defendant's conduct was in connection with the purchase or sale of a security; third, defendant used the means of interstate commerce or the facilities of a national exchange in connection with his acts or failure to disclose; and fourth, defendant acted for the purpose of defrauding buyers or sellers of securities. Defendant admits that he is, in fact, guilty of these offenses as described in counts one and two of the indictment.

## PENALTIES AND RESTITUTION

4.    The statutory maximum sentence that the Court can

2

1  impose for a violation of Title 18, United States Code, Section
2  371 is 5 years of imprisonment; a three-year period of supervised
3  release; a fine of $250,000 or twice the gross gain or gross loss
4  resulting from the offense, whichever is greatest; and a
5  mandatory special assessment of $100.   The statutory maximum
6  sentence that the Court can impose for a violation of Title 15,
7  United States Code, Sections 78j(b) and 78ff is 10 years of
8  imprisonment; a three-year period of supervised release; a fine
9  of $1,000,000 or twice the gross gain or gross loss resulting
10 from the offense, whichever is greatest; and a mandatory special
11 assessment of $100.   Therefore, the total maximum sentence the
12 court could impose is 15 years of imprisonment; a fine of
13 $1,250,000 or twice the gross gain or gross loss resulting from
14 the offense, whichever is greatest; a three-year period of
15 supervised release; and a mandatory special assessment of $200.
16      5.   Defendant understands that pursuant to 18 U.S.C.
17 § 3663A the court shall order that defendant pay restitution to
18 the victims of the offenses.   Defendant agrees that, in return
19 for the USAO's compliance with its obligations under this
20 agreement, the amount of restitution is not restricted to the
21 amounts alleged in the counts to which defendant is pleading
22 guilty and may include losses arising from counts dismissed and
23 charges not prosecuted pursuant to this agreement as well as all
24 relevant conduct in connection with those counts and charges.
25 Specifically, defendant agrees to pay restitution for defendant's
26 fraudulent scheme to manipulate the price of the following stocks
27
28                                3

1  through, among other things, disseminating false reports about

2  the stocks through the Internet:  NEI Web World, EtwoMedia,

3  WorldTradeShow.com, Big Daddy Barbecue Racing Company, Alpha One

4  Biomedical Inc., 1twoe Com., Inc., Casino Pirata.com, Inc.

5  (CSIN), Imperial Ginseng Products Limited, Classified OnLine,

6  Encounter.com, Virtual Games, Food vision, JustWebIt, YouTicket,

7  Fashionmall, and Ichargeit.  Defendant further agrees that

8  defendant will not seek the discharge of any restitution

9  obligation, in whole or in part, in any present or future

10  bankruptcy proceeding.  Defendant understands that the court will

11  follow the procedures specified in 18 U.S.C. §§ 3663A & 3664, and

12  the parties reserve their rights under those sections.

13      6.   Supervised release is a period of time following

14  imprisonment during which defendant will be subject to various

15  restrictions and requirements.  Defendant understands that if

16  defendant violates one or more of the conditions of any

17  supervised release imposed, defendant may be returned to prison

18  for all or part of the term of supervised release, which could

19  result in defendant serving a total term of imprisonment greater

20  than the statutory maximum stated above.

21                          FACTUAL BASIS

22      7.   Defendant and the USAO agree and stipulate to the

23  statement of facts attached hereto.

24              WAIVER OF CONSTITUTIONAL RIGHTS

25      8.   By pleading guilty, defendant gives up the following

26  rights:

27

28                               4

a)   The right to persist in a plea of not guilty.

b)   The right to a speedy and public trial by jury.

c)   The right to the assistance of counsel at trial, including, if defendant could not afford an attorney, the right to have the Court appoint one for defendant.

d)   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e)   The right to confront and cross-examine witnesses against defendant.

f)   The right, if defendant wished, to testify on defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

g)   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

By pleading guilty, defendant also gives up any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

## SENTENCING FACTORS

9.   Defendant understands that the Court is required to consider and apply the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") but may depart from those guidelines under some circumstances.

5

10.   Defendant and the USAO agree and stipulate to the following applicable sentencing guideline factors:

| | | | |
|---|---|---|---|
| Base Offense Level | : | <u>6</u> | [U.S.S.G. § 2F1.1(a)] |
| Specific Offense Characteristics | | | |
| (Loss) | : | <u>9</u> | [U.S.S.G. § 2F1.1(b)(1)] |
| (More than minimal planning) | : | <u>2</u> | [U.S.S.G. § 2F1.1(b)(2)] |

Defendant and the USAO agree that loss for purposes of U.S.S.G. § 2F1.1(b)(1) is limited to defendant's gains in the purchase and sale of stock in NEI Web World, EtwoMedia, WorldTradeShow.com, Big Daddy Barbecue Racing Company, Alpha One Biomedical Inc., 1twoe Com., Inc., Casino Pirata.com, Inc. (CSIN), Imperial Ginseng Products Limited, Classified OnLine, Encounter.com, Virtual Games, Food vision, JustWebIt, YouTicket, Fashionmall, and Ichargeit. Defendant agrees that this calculation does not limit defendant's obligation to make restitution to the victims of his offense based on the losses suffered by those victims, rather than the gains received by defendant. Defendant and the government agree that no other specific offense characteristics, adjustments, or departures apply, except (a) for those described in paragraph 16 below, and (b) the government reserves its right to request that the court increase defendant's offense level by 2 pursuant to U.S.S.G. § 3B1.1. The parties agree to abide by this stipulation in court and with the Probation Office.

11.   There is no agreement as to defendant's criminal history or criminal history category.

6

12.   The stipulations in this agreement do not bind either the United States Probation Office or the Court.  The  Court will determine the facts and calculations relevant to sentencing. Both defendant and the USAO are free to: (a) supplement the facts stipulated to in this agreement by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements in the Pre-Sentence Reports relating to the calculation of the sentence, and (c) argue on appeal and collateral review that the Court's sentencing calculations are not error, although each party agrees to maintain its view that the calculations in paragraph 10 are consistent with the facts of this case.

<u>DEFENDANT'S OBLIGATIONS</u>

13.   Defendant agrees:

a)   To plead guilty as set forth in this agreement.

b)   Not knowingly and willfully to fail to abide by all sentencing stipulations contained in this agreement.

c)   Not knowingly and willfully to fail to: (i) appear as ordered for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

d)   Not to commit any crime;

e)   Not knowingly and willfully to fail to be truthful at all times with Pretrial Services, the U.S. Probation Office, and the Court.

f)   To pay the applicable special assessments at or

7

1   before the time of sentencing unless defendant lacks the ability

2   to pay.

3       14.  Defendant further agrees to cooperate fully with the

4   USAO, the FBI, and as directed by the USAO, with any other

5   federal, state, or local law enforcement agency.  This

6   cooperation requires defendant to:

7           a)   Respond truthfully and completely to all questions

8   that may be put to defendant, whether in interviews, before a

9   grand jury, or at any trial or other court proceeding.

10          b)   Attend all meetings, grand jury sessions, trials

11  or other proceedings at which defendant's presence is requested

12  by the USAO or compelled by subpoena or court order.

13          c)   Produce voluntarily all documents, records, or

14  other tangible evidence relating to matters about which the USAO,

15  or its designee, inquires.

16          d)   Act, if requested to do so, in an undercover

17  capacity to the best of defendant's ability in connection with

18  criminal investigations by federal, state, or local law

19  enforcement authorities, in accordance with the instructions of

20  those law enforcement authorities.  Defendant agrees not to act

21  undercover, tape record any conversations, or gather any evidence

22  unless expressly instructed or authorized to do so by federal,

23  state, or local law enforcement authorities.

24      15.  Defendant further agrees:

25          a)   To disclose to law enforcement officials, at a

26  date and time to be set by the USAO, the whereabouts of,

27

28                                  8

1  defendant's ownership interest in, and all other information

2  known to defendant about, all monies, property or assets of any

3  kind, derived from or acquired as a result of, or used to

4  facilitate the commission of, defendant's illegal activities.

5      b)  . To fill out and deliver to the USAO a completed

6  and truthful financial statement (Form OBD-500) listing

7  defendant's assets.

8                    THE USAO'S OBLIGATIONS

9      16.  If defendant complies fully with all defendant's

10  obligations under this agreement, the USAO agrees:

11      a)    To abide by all sentencing stipulations contained

12  in this agreement.

13      b)    At the time of sentencing, provided that defendant

14  demonstrates an acceptance of responsibility for the offenses up

15  to and including the time of sentencing, to recommend a two-level

16  reduction in the applicable sentencing guideline offense level,

17  pursuant to U.S.S.G. § 3E1.1, and an additional one-level

18  reduction if available under that section.

19      c)    Except for criminal tax violations (including

20  conspiracy to commit such violations chargeable under 18 U.S.C.

21  § 371), not further to prosecute defendant for violations of 18

22  U.S.C. § 371, 15 U.S.C. § 78j(b) and 78ff, or 18 U.S.C. §§ 1341,

23  1343, arising out of defendant's participation in any conspiracy

24  to manipulate or his manipulation of the price of the following

25  stocks:  NEI Web World, EtwoMedia, WorldTradeShow.com, Big Daddy

26  Barbecue Racing Company, Alpha One Biomedical Inc., 1twoe Com.,

27

28                          9

1   Inc., Casino Pirata.com, Inc. (CSIN), Imperial Ginseng Products
2   Limited, Classified OnLine, Encounter.com, Virtual Games, Food
3   vision, JustWebIt, YouTicket, Fashionmall, and Ichargeit.
4   Defendant understands that the USAO is free to prosecute
5   defendant for any other unlawful past conduct or any unlawful
6   conduct that occurs after the date of this agreement.  Defendant
7   agrees that at the time of sentencing the Court may consider the
8   uncharged conduct in determining the applicable Sentencing
9   Guidelines range, where the sentence should fall within that
10  range, and the propriety and extent of any departure from that
11  range.

12          d)    Not to offer as evidence in its case-in-chief in
13  the above-captioned case or any other prosecution that may be
14  brought against defendant by the USAO, or in connection with any
15  sentencing proceeding in any case that may be brought against
16  defendant by the USAO, any statements made by defendant or
17  tangible evidence provided by defendant pursuant to this
18  agreement.  Defendant agrees, however, that the USAO may use such
19  statements and tangible evidence: (1) to obtain and pursue leads
20  to other evidence, which evidence may be used for any purpose,
21  including any prosecution of defendant, (2) to cross-examine
22  defendant should defendant testify, or to rebut any evidence,
23  argument or representations made by defendant or a witness called
24  by defendant in any trial, sentencing hearing, or other court
25  proceeding, and (3) in any prosecution of defendant for false
26  statement, obstruction of justice, or perjury.

27

28                              10

1          e)    Not to use any information provided by defendant

2   pursuant to this agreement against defendant with the Probation

3   Office or the Court at sentencing for the purpose of determining

4   the applicable guideline range, including the appropriateness of

5   an upward departure, and to recommend to the Court and the

6   Probation Office that such information not be used in determining

7   the point in the Sentencing Guidelines range at which defendant

8   should be sentenced.  Defendant understands, however, that

9   information provided by defendant pursuant to this agreement will

10  be disclosed to the Probation Office and the Court, and that the

11  Court may use this information for the purposes set forth in

12  U.S.S.G § 1B1.8(b).

13         f)    In connection with defendant's sentencing, to

14  bring to the Court's attention the nature and extent of

15  defendant's cooperation.

16         g)    If the USAO determines, in its exclusive judgment,

17  that defendant has provided substantial assistance to law

18  enforcement in the prosecution or investigation of another

19  ("substantial assistance"), to move the Court pursuant to

20  U.S.S.G. § 5K1.1 to impose a sentence below the sentencing range

21  otherwise dictated by the sentencing guideline.

22  DEFENDANT'S UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE

23     17.  Defendant understands the following:

24         a)    Any knowingly false or misleading statement by

25  defendant will subject defendant to prosecution for false

26  statement, obstruction of justice, and perjury and will

27

28                              11

1 | constitute a breach by defendant of this agreement.

2 | b)   Nothing in this agreement requires the USAO or any

3 | other prosecuting or law enforcement agency to accept any

4 | cooperation or assistance that defendant may offer, or to use it

5 | in any particular way.

6 | c)   Defendant cannot withdraw defendant's guilty pleas

7 | if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1

8 | for a reduced sentence or if the USAO makes such a motion and the

9 | Court does not grant it.

10 | d)   At this time the USAO makes no agreement or

11 | representation as to whether any cooperation that defendant has

12 | provided or intends to provide constitutes substantial

13 | assistance.  The decision whether defendant has provided

14 | substantial assistance rests solely within the discretion of the

15 | USAO.

16 | e)   The USAO's determination of whether defendant has

17 | provided substantial assistance will not depend in any way on

18 | whether the government prevails at any trial or court hearing in

19 | which defendant testifies.

20 | <u>BREACH OF AGREEMENT</u>

21 | 18.   If defendant, at anytime between the execution of this

22 | agreement and the completion of defendant's cooperation pursuant

23 | to this agreement or defendant's sentencing on a non-custodial

24 | sentence or surrender for service of a custodial sentence,

25 | whichever is later, knowingly violates or fails to perform any of

26 | defendant's obligations under this agreement ("a breach"), the

27 |

28 | 12

1   USAO may declare this agreement breached.  If the USAO declares

2   the agreement breached, and the Court finds such a breach to have

3   occurred, defendant will not be able to withdraw defendant's

4   guilty pleas, and the USAO will be relieved of all its

5   obligations under this agreement.  In particular:

6           a)    The USAO will no longer be bound by any agreements

7   concerning sentencing and will be free to seek any sentence up to

8   the statutory maximum for the crimes to which defendant has

9   pleaded guilty.

10          b)    The USAO will no longer be bound by any agreements

11  regarding criminal prosecution, and will be free to prosecute

12  defendant for any crime, including charges that the USAO would

13  otherwise have been obligated not to prosecute pursuant to this

14  agreement.

15          c)    The USAO will be free to prosecute defendant for

16  false statement, obstruction of justice, and perjury based on any

17  knowingly false or misleading statement by defendant.

18          d)    The USAO will no longer be bound by any agreement

19  regarding the use of statements, tangible evidence, or

20  information provided by defendant, and will be free to use any of

21  those in any way in any investigation, prosecution, or civil or

22  administrative action.  Defendant will not be able to assert

23  either (1) that those statements, tangible evidence, or

24  information were obtained in violation of the Fifth Amendment

25  privilege against compelled self-incrimination, or (2) any claim

26  under the United States Constitution, any statute, Rule 11(e)(6)

27

28                              13

1  of the Federal Rules of Criminal Procedure, Rule 410 of the

2  Federal Rules of Evidence, or any other federal rule, that

3  statements, tangible evidence, or information provided by

4  defendant before or after the signing of this agreement, or any

5  leads derived therefrom, should be inadmissible.

6      19.  Following a knowing and willful breach of this

7  agreement by defendant, should the USAO elect to pursue any

8  charge that was not filed as a result of this agreement, then:

9          a)   Defendant agrees that any applicable statute of

10 limitations is tolled between the date of defendant's signing of

11 this agreement and the USAO's discovery of any knowing and

12 willful breach by defendant.

13         b)   Defendant gives up all defenses based on the

14 statute of limitations, any claim of preindictment delay, or any

15 speedy trial claim with respect to any such prosecution except to

16 the extent that such defenses existed as of the date of

17 defendant's signing of this agreement.

18        LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

19     20.  Defendant gives up the right to appeal any sentence

20 imposed by the Court, including any order of restitution, and the

21 manner in which the sentence is determined, provided that (a) the

22 sentence is within the statutory maximum specified above and is

23 constitutional, (b) the Court does not depart upward in offense

24 level or criminal history category, and (c) the Court determines

25 that the total offense level is 16 or below and imposes a

26 sentence within the range corresponding to the determined total

27

28                              14

1  offense level. Defendant also gives up any right to bring a
2  post-conviction attack on the convictions or sentence, including
3  any order of restitution, except a post-conviction attack based
4  on a claim of ineffective assistance of counsel, a claim of newly
5  discovered evidence, or an explicitly retroactive change in the
6  applicable Sentencing Guidelines, sentencing statutes, or
7  statutes of conviction.

8      21. The USAO gives up its right to appeal the Court's
9  Sentencing Guidelines calculations, provided that (a) the Court
10 does not depart downward in offense level or criminal history
11 category (except by a downward departure in offense level
12 pursuant to, and to the extent requested by, the USAO in a motion
13 under U.S.S.G. § 5K1.1) and (b) the Court determines that the
14 total offense level is 16 or above prior to any departure under
15 U.S.S.G. § 5K1.1.

16               RESULT OF VACATUR, REVERSAL OR SET-ASIDE

17     22. Defendant agrees that if any count of conviction is
18 vacated, reversed, or set aside, the USAO may: (a) ask the Court
19 to resentence defendant on any remaining count of conviction,
20 with both the USAO and defendant being released from any
21 stipulations regarding sentencing contained in this agreement,
22 (b) ask the Court to void the entire plea agreement and vacate
23 defendant's guilty plea on any remaining count of conviction,
24 with both the USAO and defendant being released from all of their
25 obligations under this agreement, or (c) leave defendant's
26 remaining conviction, sentence, and plea agreement intact.

27

28                     15

1  Defendant agrees that the choice among these three options rests
2  in the exclusive discretion of the USAO.

### SCOPE OF AGREEMENT

4      23.  The Court is not a party to this agreement and need not
5  accept any of the USAO's sentencing recommendations or the
6  parties' stipulations.  Even if the Court ignores any sentencing
7  recommendation, finds facts or reaches conclusions different from
8  any stipulation, and/or imposes any sentence up to the maximum
9  established by statute, defendant cannot, for that reason,
10 withdraw defendant's guilty pleas, and defendant will remain
11 bound to fulfill all defendant's obligations under this
12 agreement.  No one -- not the prosecutor, defendant's attorney,
13 or the Court -- can make a binding prediction or promise
14 regarding the sentence defendant will receive, except that it
15 will be within the statutory maximum.

16     24.  This agreement applies only to crimes committed by
17 defendant, has no effect on any proceedings against defendant not
18 expressly mentioned herein, and shall not preclude any past,
19 present, or future forfeiture actions.

### NO ADDITIONAL AGREEMENTS

21     25.  Except as set forth herein, there are no promises,
22 understandings or agreements between the USAO and defendant or
23 defendant's counsel.  Nor may any additional agreement,
24 understanding or condition be entered into unless in a writing
25 signed by all parties or on the record in court.

1   This agreement is effective upon signature by defendant and

2   an Assistant United States Attorney.

3   AGREED AND ACCEPTED

4   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF CALIFORNIA

5   ALEJANDRO N. MAYORKAS

6   United States Attorney

7

8   _____          _____
    MANUEL A. ABASCAL                    Date
9   Assistant United States Attorney

10

11  _____          _____
    CHRISTOPHER M. E. PAINTER            Date
    Assistant United States Attorney
12

13      I have read this agreement and carefully discussed every

14  part of it with my attorney.  I understand the terms of this

15  agreement, and I voluntarily agree to those terms.  My attorney

16  has advised me of my rights, of possible defenses, of the

17  Sentencing Guideline provisions, and of the consequences of

18  entering into this agreement.  No promises or inducements have

19  been made to me other than those contained in this agreement.  No

20  one has threatened or forced me in any way to enter into this

21  agreement.  Finally, I am satisfied with the representation of my

22  attorney in this matter.

23

24  _____          2/28/00
    ARASH AZIZ-GOLSHANI                  Date
25  Defendant

26      I am Arash Aziz-Golshani's attorney.  I have carefully

27

28                              17

discussed every part of this agreement with my client.  Further,
I have fully advised my client of his rights, of possible
defenses, of the Sentencing Guideline provisions, and of the
consequences of entering into this agreement.  To my knowledge,
my client's decision to enter into this agreement is an informed
and voluntary one.

_____          2/28/00
RALPH HIRSCHMANN                          Date
Counsel for Defendant
ARASH AZIZ-GOLSHANI

18

STATEMENT OF FACTS

Beginning on a date unknown and continuing to on or about December 15, 1999, in the Central District of California and elsewhere, defendant, co-defendant Hootan Melamed, and others, knowingly combined, conspired and agreed to violate Title 15, United States Code, Sections 78j(b) and 77ff and Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, knowingly and willfully, and with the intent to defraud by (1) engaging in a scheme to defraud and (2) making an untrue statement of a material fact, and omitting to state a material fact necessary to make the statement, in light of the circumstances under which it was made, not misleading, in connection with the purchase or sale of securities, and using any means and instrumentalities of interstate commerce.

Defendant became a member of the conspiracy knowing of its object to violate the securities laws and intending to help accomplish that object.  The conspiracy and scheme to defraud operated, in part, as follows:

Defendant, Melamed, and others purchased, and caused others to purchase, large numbers of shares of NEI stock at a low price. Defendant, Melamed, and others created and obtained numerous "screen names" to be used on Internet bulletin board services including Yahoo! Finance, Raging Bull and FreeRealTime.   A "screen name" is a name that is obtained from an Internet service provider and used to communicate and receive messages on the Internet.   False and fictitious identifying information was used

19

1   when obtaining these "screen names."

2   In order to manipulate the price of NEI stock, specifically
3   to induce other investors to purchase shares of NEI stock and to
4   inflate the price of NEI stock, defendant, Melamed, and others
5   acting at his direction used the various screen names to post
6   messages promoting NEI on hundreds of Internet bulletin boards,
7   including those of Yahoo! Finance, Raging Bull, and FreeRealTime.

8   The messages defendant, Melamed, and his coconspirators
9   posted and caused to be posted contained untrue statements of
10  material facts, and omitted to state material facts necessary to
11  make the messages not misleading, in that:  (1) the messages
12  claimed that the price of NEI would increase dramatically because
13  of an upcoming merger, when in truth and fact, as defendant,
14  Melamed, and their co-conspirators then knew, there was no such
15  merger; and (2) the messages were sent under numerous screen
16  names thereby creating the false and misleading impression that
17  many different people thought the NEI stock would rise, when in
18  truth and fact, as defendant, Melamed, and their co-conspirators
19  then knew, the messages were prepared and sent by defendant,
20  Melamed, and other coconspirators.

21  As a result of the false messages posted by defendant,
22  Melamed, and his coconspirators, the price of NEI stock
23  substantially increased.  Thereafter, defendant, Melamed, and his
24  coconspirators sold their NEI stock at the artificially inflated
25  prices.  When the price of NEI stock subsequently collapsed,
26  other individuals who had bought at the artificially inflated

27

28                                    20

1 | prices lost substantial amounts of money.

2 |     In furtherance of the conspiracy and to carry out the
3 | objects thereof, defendant committed and caused the commission of
4 | numerous overt acts within the Central District of California and
5 | elsewhere, including the following, among others:

6 |     a.   On or about November 10, 1999, defendant
7 | purchased, and caused to be purchased, 10,000 shares of NEI at a
8 | price of 9 cents per share, using his WebStreet account.

9 |     b.   On or about November 12, 1999, defendant
10 | purchased, and caused to be purchased, 20,000 shares of NEI at a
11 | price of 13 cents per share, using his WebStreet account.

12 |     c.   On or about November 14, 1999, defendant met with
13 | co-conspirators at the UCLA Biomed Library.  Defendant used, and
14 | instructed others to use, the computers at the UCLA Biomed
15 | Library to create numerous Internet screen names to be used as
16 | aliases.

17 |     d.   On or about November 14, 1999, defendant met with
18 | his co-conspirators at the Biomed Library, and instructed these
19 | people to use the alias screen names to post on numerous Internet
20 | bulletin boards devoted to the exchange of information of various
21 | stocks false messages claiming that NEI would be purchased by LGC
22 | Wireless.

23 |     e.   On or about November 15, 1999, defendant sold his
24 | stock in NEI realizing a profit of $151,375.

25 |     On or about November 15, 1999, defendant knowingly and
26 | willfully and with intent to defraud, directly and indirectly and

27 |

28 |                            21

using any means and instrumentality of commerce, employed the
scheme to defraud described above, and made the untrue statements
of material facts described above, in connection with the sale of
10,000 shares of NEI at $7.56 per share.

22

# DECLARATION OF ARASH AZIZ-GOLSHANI

I, Arash Aziz-Golshani, do declare the following:

I was born in Iran and immigrated to the United States at age 9 in the year 1985. I have been a lawful permanent resident since then. My mother is a United States citizen and I have never known my father. Other members of my family are also United States citizens. I have no family in Iran.

On March 5, 2000 I pled guilty in federal court and received a sentence of 15 months in prison and ordered to pay restitution in the amount of $566,000. I was in my early twenties when the events took place leading to my conviction and I must admit that I was extremely reckless and foolhardy to engage in those activities. However, I am still very confused and ignorant as to how the restitution figure was arrived at.

I was represented by attorney Ralph F. Hirschmann who advised me to plead guilty and entered into negotiations leading to my change of plea. Since I did not have a father, my uncle Albert Bootehsaz accompanied me to some of the meetings I had with my attorney. I was told by Mr. Hirschmann that if I cooperated with the government I most likely would avoid any prison sentence and also that the prosecutor was not at that time asking for any specific restitution amount. At the time of my guilty plea the restitution issue was to remain open.

However, by the time I was being sentenced on this case a different prosecutor took over the matter and demanded the 15 month sentence as well as the restitution referred to above. My attorney apparently did nothing to contest the restitution figure put forward by the prosecutor nor to reduce my imprisonment time. The SEC was in the process of obtaining a civil judgment against me and my attorney never tried to forestall the restitution figure until the SEC had made a final determination. In fact it later turned out that SEC's figure was substantially lower than the prosecutor's.

At no time did my attorney ever explain to me the immigration consequences of the guilty plea and the sentence that I received. In fact this issue was not even discussed at my guilty plea nor at my sentencing hearing. I made it very clear to Mr. Hirschmann that I was not a U.S. citizen but rather a citizen of Iran. He continually told me that whatever immigration problems I may have in the future "could be fixed later." He claims to have discussed this matter with an immigration specialist but I have recently learned that the crime to which I entered a plea of guilty was clearly an

aggravated felony under immigration law since it was a crime involving fraud where the loss was over $10,000. My current attorney has specifically shown me the code section that explains this and has told me that this is fundamental immigration law and it seems highly unlikely that Mr. Hirschmann consulted with an immigration specialist or he consulted with somebody who did know the subject matter.

Mr. Hirschmann never explained to me that it was possible to limit the restitution order to less than $10,000 in the criminal court judgment and allow a civil judgment over $10,000 through the SEC to make up the total. This could have prevented me from becoming an aggravated felon. My attorney also did not make any attempt to reduce my sentence below one year which also would have helped me to prevent extremely serious immigration consequences.

If I had known that my guilty plea would have resulted in such horrendous immigration consequences, being barred from keeping my permanent resident status for the rest of my life, I certainly would not have entered a plea of guilty at that time. I would have insisted that my attorney continue to negotiate with the Government and explain to them these dire consequences so that possibly my guilty plea and the sentence could be modified accordingly. As a last resort, I would have definitely taken this case to trial and taken my chances with a jury. I do not believe that I would have received a more serious penalty even if I had lost considering my clean record and my youth. I do not believe that Mr. Hirschmann did enough investigation into potential defenses I had nor explain to me what defenses I may have had had I gone to trial.

I had no idea that my guilty plea would have such serious consequences until I was placed in deportation proceedings and my permanent residence status was taken away from me. I consulted with a few lawyers who said they could not help me. It was only this year that I received advice from an attorney, who referred me to Mr. Avazian, that there is a possibility of getting relief from my aggravated felony based on a recent Supreme Court decision.

I have since learned that there were things that my criminal attorney could have done to help me prevent this consequence. I am unable to regain my permanent residence status unless this aggravated felony is removed from my record. Without my criminal lawyer's misadvice and even total lack of advice regarding immigration consequences, I would not be in the precarious position I now find myself. Because Mr. Hirschmann himself was ignorant of the immigration consequences, it is highly probable that he never discussed such issues with the prosecutors and explain to them precisely what the consequences would be to me as a result of this conviction

and sentence. I have enough faith in our judicial system that I believe the prosecutors office and the court would have been open to suggestions regarding ways to avoid an aggravated felony on my record. Unfortunately, I was never given this opportunity due to the ineffective representation by my attorney.

I only ask that the court give every consideration to my situation and allow my case to be reopened after all these years so that I will have a future in the United States. I have successfully completed my prison sentence, probation and have been a model citizen in the last ten years. I respectfully request your help.

I swear under penalty of perjury that the above statement is true and correct.

Date: 2-28-11

Arash Aziz-Golshani

1

2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

3                           - - -

4    HONORABLE GARY ALLEN FEESS, JUDGE PRESIDING

5                           - - -

6

7    UNITED STATES OF AMERICA,          )
8         Plaintiff,                    )
                                        )
9         vs.                           )     No. CR 00-07 GAF
                                        )
     ARASH AZIZ-GOLSHANI,               )
10        Defendant.                    )

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                           Change of Plea
16                    Los Angeles, California
                    Wednesday, March 15, 2000
17

18

19                        COPY

20

21   _____

22           DAVID A. SALYER, CSR,RMR
                Official Court Reporter
23              License No. 4410
                255 East Temple Street
                      Room 1179-E
24        Los Angeles, California  90012
          P: 213/687-4148 * F: 213/687-0576

25

```
 1   APPEARANCES:

 2   FOR THE UNITED STATES OF AMERICA:

 3           OFFICE OF THE UNITED STATES ATTORNEY
             BY:  MANUEL ABASCAL, ESQ.
 4           1132 United States Courthouse
             312 North Spring Street
 5           Los Angeles, California 90012
             213/894-6682
 6
     FOR THE DEFENDANT:
 7
             LAW OFFICES OF RALPH F. HIRSCHMANN
 8           BY:  RALPH F. HIRSCHMANN, ESQ.
             & ROBIN L. DIEM, ESQ.
 9           707 Wilshire Boulevard
             Suite 4910
10           Los Angeles, California   90017
             213-891-1700
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    LOS ANGELES, CALIFORNIA, WEDNESDAY, MARCH 15, 2000

2                          9:10 A.M.

3            THE CLERK:  Calling case number CR 00-07 GAF,

4    United States of America versus Golshani.

5            Counsel, please state your appearances.

6            MR. ABASCAL:  Manuel Abascal for the United States.

7            MS. DIEM:  Good morning,  your Honor. Robin Diem

8    and Ralph Hirschmann for the defendant who is present.

9            THE COURT:  Good morning, counsel.

10           This matter is on today, as I understand it, for a

11   change of plea; is that correct?

12           MS. DIEM:  Yes.

13           THE COURT:  And that is going to be pursuant to a

14   written agreement that has been reached between the

15   Government and Mr. Golshani?

16           MR. ABASCAL:  Yes.

17           THE COURT:  All right.  Anything we need to discuss

18   before take the plea?

19           MS. DIEM:  No, your Honor.

20           MR. ABASCAL:  No.

21           THE COURT:  All right.  Well, let's proceed, then.

22           All right.  Before we go forward, will the clerk

23   please swear Mr. Golshani.

24           THE CLERK:  Please stand, raise your right hand.

25           (Defendant sworn.)

1            THE DEFENDANT:  Yes.

2            THE CLERK:  Thank you.  You may be seated.

3            THE COURT:  All right.

4            I will tell you what, counsel, why don't you and

5    Mr. Golshani stand at the lectern in case there is anything

6    that you folks need to discuss at the time and also so that

7    you have the microphone handy.

8            Mr. Golshani, let me give you a little bit of

9    information before we proceed any further.

10           Before I take your plea in this case, I have to be

11   satisfied that you have made it freely and voluntarily.

12           I have to be satisfied that you understand the

13   nature and the consequences of the plea that you are making

14   here today and I have to be confident that you are knowingly

15   giving up certain constitutional rights that you have in this

16   case.  And for that reason I'm going to be asking you a

17   number of questions.  Those questions have to be answered

18   truthfully here in court.

19           Do you understand that, sir?

20           THE DEFENDANT:  I do.

21           THE COURT:  Since I have placed you under oath,

22   your failure to respond truthfully to any of the questions

23   that I ask of you could subject you to prosecution for

24   perjury.

25           Do you understand that?

1    THE DEFENDANT:  Yes.

2    THE COURT:  And for your information perjury is a

3 separate felony offense which carries a maximum term of

4 imprisonment of five years and a maximum fine of $250,000.

5    Do you understand that, sir?

6    THE DEFENDANT:  Yes.

7    THE COURT:  If during the course of this plea there

8 is something that I say or ask that you do not understand,

9 please let me know and I will attempt to repeat it or explain

10 it or otherwise clarify it.

11    Do you understand that?

12    THE DEFENDANT:  Yes, I do.

13    THE COURT:  And, likewise, if you have some

14 difficulty understanding some matter and you wish to consult

15 with your counsel during the course of this plea, you may do

16 so as well.

17    Do you understand that, sir?

18    THE DEFENDANT:  Yes.

19    THE COURT:  All right.

20    Is Arash Aziz-Golshani your true and correct name?

21    THE DEFENDANT:  That is correct.

22    THE COURT:  How old are you, Mr. Golshani.

23    THE DEFENDANT:  23.

24    THE COURT:  How far did you go through school?

25    THE DEFENDANT:  Graduated UCLA with a B.A.

1       THE COURT:  Are you a native English speaker?

2       THE DEFENDANT:  Yes.

3       THE COURT:  Have you taken any alcohol, drugs or

4   medications in the past 24 hours?

5       THE DEFENDANT:  No.

6       THE COURT:  Are you under the care of a doctor or a

7   psychiatrist?

8       THE DEFENDANT:  No.

9       THE COURT:  Are you taking any medication at the

10  present time or are you --  have you taken any medication

11  this morning, for instance?

12      THE DEFENDANT:  I just took some Tylenol.

13  I have the flu.

14      THE COURT:  Other than that, nothing?

15      THE DEFENDANT:  I'm fine.

16      THE COURT:  Do you know any of reason why we can't

17  go forward to take your plea today?

18      THE DEFENDANT:  Huh-huh.

19      THE COURT:  And, counsel, do you have any reason to

20  believe that the defendant is not competent to enter his

21  guilty plea at this time?

22      MS. DIEM:  No, your Honor.

23      THE COURT:  All right.  Is there any reason at all

24  why we shouldn't go forward with this plea?

25      MS. DIEM:  No.

1          THE DEFENDANT:   No.

2          THE COURT:   Now, Mr. Golshani, in this case the

3   Government has filed an indictment entitled United States of

4   America versus Arash Aziz Golshani and Hootan Melamed

5   charging violations of 18 United States code Section 371, 15

6   United States Code Section 78(j), Subsection B, and aiding

7   and abetting.

8          In essence, it is a securities fraud case.

9          Have you had or have you received a copy of the

10  indictment in this matter?

11         THE DEFENDANT:   Yes.

12         THE COURT:   Have you had a chance to read it?

13         THE DEFENDANT:   Yes.

14         THE COURT:   Do you understand the nature of the

15  charges which are pending against you in this case?

16         THE DEFENDANT:   I do.

17         THE COURT:   All right.   Would the United States

18  please advise the defendant of the elements of the case that

19  would have to be proven to succeed if this case were to

20  proceed to trial?

21         MR. ABASCAL: Yes, your Honor.

22         The elements as to a conspiracy count are as

23  follows.   First, there was an agreement between defendant and

24  one other person to commit a criminal act, in this case

25  securities fraud in violation of Title 15, United States Code

1    Section 78 (j) B and 78 ff.

2            Second, defendant became a member of the conspiracy

3    knowing at least one of its objects and intending to help

4    accomplish it.

5            And, third, one of the members of the conspiracy

6    committed at least one overt act for the purpose of carrying

7    out the conspiracy.

8            Also in order for defendant to be found guilty of

9    count 2 which charges a violation of 15 United States Code

10   section 78(j) B and section 77ff the following must be true.

11           First, defendant used a device or schemed to

12   defraud someone or made an untrue statement of material fact,

13   second, defendant's conduct was in connection with a purchase

14   or sale of a securities, third, defendant used the means of

15   interstate commerce on the facilities of a national exchange

16   in connection with his acts or failure to disclose, and,

17   fourth, defendant acted for the purpose of defrauding buyers

18   and sellers of securities.

19           THE COURT:  All right.  Thank you.

20           Now, did you hear what the Assistant United States

21   Attorney just had to say, Mr. Golshani?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Do you have any questions about the

24   elements of the charge against you in this case?

25           THE DEFENDANT:  No.

1        THE COURT:  Have you fully discussed the charges

2   against you in this matter with your counsel, any defenses

3   that you may have to those charges and all of the facts and

4   circumstances relating to charges which are pending against

5   you?

6        THE DEFENDANT:  Yes, I have.

7        THE COURT:  Is there anything at this point in time

8   that you feel you need to discuss further with the counsel

9   before you go forward with your plea?

10        THE DEFENDANT:  No.

11        THE COURT:  Are you satisfied with the

12   representation that you have received in this case?

13        THE DEFENDANT:  Yes.

14        THE COURT:  Do you need any additional time to

15   speak with your attorney before entering your plea here

16   today?

17        THE DEFENDANT:  No.

18        THE COURT:  And, again, as I previously indicated,

19   as I understand it, your willingness to enter into a guilty

20   plea today is the result of discussions between you and your

21   counsel and the Government which have resulted in this

22   written plea agreement; is that correct?

23        THE DEFENDANT:  That is correct.

24        THE COURT:  Has anyone threatened you or anyone

25   close to you to get you to enter your guilty plea here

1    today?

2            THE DEFENDANT:  No.

3            THE COURT:  You understand that if I accept this

4    guilty plea, that there is not going to be a trial in this

5    case because you will have waived and given up your right to

6    a trial?

7            THE DEFENDANT:  I understand.

8            THE COURT:  All right.  And are you pleading guilty

9    in this case because you believe that it is in the best

10   interests --  in your best interests to do so?

11           THE DEFENDANT:  Yes.

12           THE COURT:  All right.  With respect to the plea

13   agreement, I have before me a document which is entitled plea

14   agreement for defendant Arash Aziz Golshani.  It bears this

15   case caption and this case number.

16           The document appears to be approximately 22 pages

17   in length.

18           Page 18 appears to be the end of the agreement and

19   then there is a statement of facts attached set forth at

20   pages 19 and 22.

21           Let me ask you, sir, do you have a copy of this

22   agreement there with you at the lectern?

23           THE DEFENDANT:  Yes, I do.

24           THE COURT:  I have on page 17 of that a signature

25   line for you which appears to bear your signature dated

1    February 28th, the year 2000.

2              Do you see that, sir?

3              THE DEFENDANT:  That is correct.

4              THE COURT:  Is that your signature?

5              THE DEFENDANT:  Yes, it is.

6              THE COURT:  All right.  And on page 18,

7    Mr. Hirschmann, is that your signature as his counsel?

8              MR. HIRSCHMANN:  It is, your Honor.

9              THE COURT:  All right.  Mr. Golshani, have you had

10   an opportunity to read and discuss this plea agreement with

11   your attorney before you signed it?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And does it represent the entirety of

14   your agreement with the Government?

15             What I mean by that, is everything that you and the

16   Government agreed to contained in this document?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Has anyone made any promises or

19   assurances to you of any kind other than those which are

20   stated in this plea agreement to induce you to plead guilty

21   in this case?

22             THE DEFENDANT:  No.

23             THE COURT:  All right.

24             Counsel, is this an E 1(b) type agreement?

25             MR. ABASCAL:  The sentence is left open in the

1     Court's discretion.

2              THE COURT:  Are there counts to be dismissed?

3              MR. ABASCAL:  No, your Honor.

4              THE COURT:  So the only two counts and sentence is

5     open.

6              So it would be, then, under 11 (e)1(b).

7              Now, Mr. Golshani, that is a lot of technical talk

8     but what it means is this, that the terms of this agreement

9     are only recommendations to the Court, that I can reject

10    those recommendations without permitting you to withdraw your

11    guilty plea in this case and I can, in theory, at least,

12    impose a sentence which is more severe than you may

13    anticipate.

14             Do you understand that?

15             THE DEFENDANT:  I do.

16             THE COURT:  All right.  And with that

17    understanding, is it still your desire to go forward with

18    your plea in this case?

19             THE DEFENDANT:  Yes, it is.

20             THE COURT:  All right.  Before I take your plea, I

21    have to be certain that you understand and wish to waive

22    certain of your constitutional rights.

23             I know that there is a section of the plea

24    agreement which addresses that, but that is something I need

25    to address with you also here in open court.

1          First of all, you have the right to plead or to

2     persist in a plea of not guilty and force the Government to

3     prove its case against you at trial.

4          At trial they would have the burden of proof beyond

5     a reasonable doubt and they would have to have a unanimous

6     jury to convict.

7          Do you understand that, sir?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you waive your right to plead or

10    persist in a plea of not guilty in this case?

11         THE DEFENDANT: Yes.

12         THE COURT:  And as I have said, your right to trial

13    would be to a speedy and public trial.

14         You do have a right to trial by jury at that time.

15         The burden would be on the Government to prove the

16    case against you beyond a reasonable doubt.

17         Do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Do you waive and give up your right to

20    a speedy and public trial by jury?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you also understand that if the

23    Government agreed that you could have a trial before the

24    Court, that is where I would decide the case without a jury

25    making a decision.

1      Do you understand that that is a possibility?

2      THE DEFENDANT:  Yes.

3      THE COURT:  Do you waive and give up any right that

4  you may have to a court trial in this matter?

5      THE DEFENDANT: Yes.

6      THE COURT:  At trial you would have the right to

7  confront and cross-examine witnesses.

8      What that means is that the Government would have

9  to bring its witnesses here in open court, put them on the

10  witness stand right over here to my right under oath and have

11  them give their evidence in open court.

12      After they gave their evidence your counsel would

13  have the right to question them, that is, the right to

14  cross-examine.

15      Do you understand those rights?

16      THE DEFENDANT:  Yes.

17      THE COURT:  Do you waive and give them up?

18      THE DEFENDANT:  Yes.

19      THE COURT:  At trial you would have the right to

20  present a defense and to use the free subpoena power of the

21  Court to compel witnesses to appear and give testimony.

22      Do you understand that?

23      THE DEFENDANT:  I do.

24      THE COURT:  Do you waive and give up those rights?

25      THE DEFENDANT:  Yes.

1        THE COURT:  You also have a privilege against

2   self-incrimination which is sometimes referred to as the

3   right to remain silent.

4        Do you understand that by entering a plea of guilty

5   here today you are waiving and giving up that right because

6   by virtue of your plea you are incriminating yourself?

7        Do you understand that, sir?

8        THE DEFENDANT:  Yes.

9        THE COURT:  Do you waive and give up your privilege

10   against self-incrimination?

11        THE DEFENDANT:  Yes.

12        THE COURT:  On the other hand, if we did have a

13   trial and you wished to testify, you would have the right to

14   take the stand and testify on your own behalf.

15        Do you understand that?

16        THE DEFENDANT:  Yes.

17        THE COURT:  Do you waive and give up that right?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Let's see.

20        What are the appellate waivers in this agreement,

21   counsel?

22        MR. ABASCAL:  There is a limited mutual waiver of

23   appeal.

24        Both the defense and the Government have agreed to

25   waive their rights to appeal provided that the sentence is

1   within a certain range.

2          The defense has agreed they will waive their right

3   to appeal provided that the Court finds a final offense level

4   to be 16 or below.

5          THE COURT:  Or below?

6          MR. ABASCAL:  And, likewise, the Government has

7   agreed to waive its rights to above.

8          THE COURT:  If it's 16 or above?

9          MR. ABASCAL:  16 or above, your Honor.

10         THE COURT:  Do you understand, Mr. Golshani, that

11  you would ordinarily have a right to challenge a sentence on

12  certain grounds but that in this case you are waiving and

13  giving up your right to appeal unless the Court determines

14  that the guideline range is above a level 16, do you

15  understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  All right.  Do you have any questions

18  that you need to talk to your counsel about with respect to

19  that appellate right?

20         THE DEFENDANT:  No, I think it's okay.

21         THE COURT:  All right.  So you waive and give up

22  your right to appeal in all other circumstances?

23         THE DEFENDANT:  Correct.

24         THE COURT:  All right.  Counsel, are you satisfied

25  that the waivers in this case are made knowingly and

1    voluntarily and do you join in and concur in each of the

2    waivers made by the defendant in this case?

3            MS. DIEM:  Yes, your honor.

4            THE COURT:  All right.

5            Mr. Golshani, there are a number of consequences or

6    possible consequences that flow from your guilty plea.

7            At first, I'm going to ask the Assistant United

8    States Attorney to state for the record the possible range of

9    punishment, including the statutory maximum sentence,

10   including imprisonment, all applicable fines and any term of

11   supervised release.

12           MR. ABASCAL:  The maximum sentence looking at both

13   offenses combined is 15 years imprisonment, a fine of

14   $1,250,000 or twice the gross gain or gross loss resulting

15   from the offense, a three-year period of supervised release

16   and a mandatory special assessment of $200.

17           In addition, the defendant will be required to pay

18   restitution for the full losses of this offense as well as

19   other conduct not specified in the indictment.

20           THE COURT:  All right.

21           Mr. Golshani, have you heard what the Assistant

22   United States Attorney has just said?

23           THE DEFENDANT:  Yes.

24           THE COURT:  Do you have any questions regarding

25   what the United States Attorney has just said?

1    THE DEFENDANT:  No.

2    THE COURT:  Do you understand that those are

3  potential consequences of your guilty plea in this case?

4    THE DEFENDANT:  Yes.

5    THE COURT:  Do you also understand that parole has

6  been abolished which means that if you were to serve a term

7  in custody, you would not be placed on parole.

8    Upon your release, there would be a term of what is

9  called supervised release where would you be under the

10  supervision of the Court for some period of time.

11    I believe, did you say three years maximum,

12  counsel?

13    MR. ABASCAL:  Yes, your Honor.

14    THE COURT:  All right.

15    So do you understand that? You would be under

16  supervised release for up to three years after you were

17  released from any period of custody?

18    THE DEFENDANT:  Yes.

19    THE COURT:  All right.  And while this probably

20  does not apply in this case, I want to at least advise you

21  that it is at least possible that if you violate a term of

22  supervised release, that you could be returned to prison.

23    Do you understand that?

24    THE DEFENDANT:  Yes.

25    THE COURT:  And that it is possible that depending

1   on the length of your sentence otherwise, going back to

2   prison after a period of supervised release at least in

3   theory means you could serve more time in custody than the

4   maximum provided by the statute.

5           Do you understand that?

6           THE DEFENDANT: Yes, sir.

7           THE COURT:  All right.  This is a sentencing

8   guidelines case.  We have already made reference to that.

9           Have you discussed the sentencing guidelines with

10  your attorney and how they may apply to you in this case?

11          THE DEFENDANT:  I have.

12          THE COURT:  All right.  Do understand that the

13  Court is not going to be able to determine what the guideline

14  sentence to impose in this case until after it has received a

15  copy of the presentence report and the parties have had a

16  chance to challenge the information in that presentence

17  report, including the application for guideline factors?

18          Do you understand that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Do you also understand that the Court

21  has the authority in some circumstances to depart from the

22  guidelines and impose a sentence that may be either more or

23  less severe than the guidelines would provide?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And we have already discussed this, but

1    I will mention it.

2          Do you understand that in some circumstances in

3    this case that if you do have an offense level which is rated

4    higher than 16, you would have a right to appeal from the

5    sentence imposed in this case?

6          THE DEFENDANT:  Yes.

7          THE COURT:  And do you understand that the

8    Government has preserved its right to appeal if the guideline

9    level is below a level 16?

10         THE DEFENDANT:  Yes.

11         THE COURT:  All right.

12         Other potential consequences that relate to this

13   conviction include an order of restitution, and I should have

14   re-read the agreement last night.

15         I believe that this agreement provides for a

16   restitution award, does it not?

17         MR. ABASCAL:  Yes, it does, your Honor.

18         THE COURT:  Could you state what it is for the

19   record?

20         MR. ABASCAL:  Well, the restitution, the amount,

21   has not yet been determined, your Honor.

22         THE COURT:  All right.

23         MR. ABASCAL:  It will be subject to, I think,

24   differing arguments.

25         THE COURT:  All right.

1   MR. ABASCAL:  Before the Court, although we have

2   agreed that defendant is liable for restitution for a variety

3   of trading in other stocks, not just the ones listed in the

4   indictment.

5   THE COURT:  I apologize.

6   I was thinking of one of my Monday cases where

7   there had been an agreement between the Government and the

8   defendant as to the amount.

9   But in this case, then, there is going to be a

10  dispute on restitution, apparently.

11  Mr. Golshani, the Court under the law can and in

12  all likelihood will make some order of restitution in this

13  case.

14  Do you understand that?

15  THE DEFENDANT:  Yes.

16  THE COURT:  And do you understand that the Court

17  may, in this case, require the giving of the notice of the

18  conviction to certain victims of the fraud?

19  Do you understand that that is at least a

20  possibility?

21  THE DEFENDANT:  Yes.

22  THE COURT:  All right.  There are some other

23  possible consequences.  These may be somewhat hypothetical,

24  but I just wanted to make sure we have touched on them for

25  the record.

```
 1            I don't know if any of your conduct has generated
 2    any interest by state authorities, but in the event that it
 3    did and I imposed a sentence in this case and you were later
 4    convicted of a state crime and sentenced to a term of
 5    imprisonment at a later point in time, I cannot order that
 6    the sentence I impose in this case run concurrently to some
 7    future imposed state sentence.
 8            Do you understand that?
 9            THE DEFENDANT:  Yes.
10            THE COURT:  All right.  And I don't know if this
11    applies.
12            If you have any kind of state probation outstanding
13    or parole, your conviction in this case would, in all
14    likelihood, result in a violation of that probation or parole
15    and could result in further incarceration.
16            Do you understand that?
17            THE DEFENDANT:  Yes.
18            THE COURT:  Is there anything about any of the
19    consequences that we have discussed here this morning that
20    you have any question about whatsoever?
21            THE DEFENDANT:  None.
22            THE COURT:  With the consequences that we have
23    discussed in mind, is it still your desire to enter a guilty
24    plea in this case?
25            THE DEFENDANT:  Yes.
```

1      THE COURT:  Counsel, are you satisfied that the

2   defendant understands and appreciates the potential

3   consequences of his guilty plea in this matter?

4      MS. DIEM:  Yes, your Honor.

5      THE COURT:  All right.

6      Let's turn to the charges, then.

7      The indictment in this case, as I have indicated,

8   is in two counts.

9      The first count charges a violation of 18 USC

10   Section 371, conspiracy to commit securities fraud and count

11   2 is a substantive count of securities fraud.  I believe it's

12   an aiding and abetting count, aiding and abetting securities

13   fraud.

14      And, the third count is just against Mr. Melamed

15   correct?  Mr. Golshani is only in one and two?

16      MR. ABASCAL:  That's correct, but the second count

17   is a direct charge, not just aiding and betting.

18      THE COURT:  All right.

19      So conspiracy to commit securities fraud and

20   securities fraud.

21      Do you under that those are the charges against

22   you, sir?

23      THE DEFENDANT:  Yes.

24      THE COURT:  All right.  As to the charges that are

25   pending against you in counts 1 and 2, how do you now plead,

1    guilty or not guilty?

2              THE DEFENDANT:  Guilty.

3              THE COURT:  And are you pleading guilty to those

4    charges because you, in fact, did the things that have been

5    alleged against you?

6              THE DEFENDANT:  Yes.

7              THE COURT:  In connection with the plea agreement,

8    there is an agreed-upon statement of facts which is

9    attached.

10             I presume that that is intended to establish the

11   factual basis for the plea; is that correct, counsel?

12             MR. ABASCAL: Yes.

13             THE COURT:  All right.  Mr. Golshani, do you have

14   in front of you starting at page 19 and going through to page

15   22 of the agreement, do you have that in front you, sir?

16             THE DEFENDANT:  Yes.

17             THE COURT:  That is captioned on page 19, statement

18   of facts.

19             Have you read that statement of facts prior to

20   today?

21             THE DEFENDANT:  Yes.

22             THE COURT:  And do you agree and adopt all of the

23   things that are set forth in that statement of facts?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And is there anything that the

1    assistant U.S. Attorney wants to add to the record that is

2    beyond what is set forth on the written statement of facts

3    which has been adopted by the defendant here in open court?

4            MR. ABASCAL:  Your Honor, I would just ask to read

5    the facts.

6            I know it's cumbersome, but the Ninth Circuit does

7    require the facts to be stated on the record and we can't

8    incorporate them, even though they are in the plea agreement.

9            THE COURT:  Well, we have a different view about

10   what the Ninth Circuit -- I know they require an inquiry, but

11   my view is that the case law is such that the set the

12   statement of facts out and I have the defendant acknowledge

13   it in open court, but if you wanted to read it, you may do

14   so.

15           MR. ABASCAL:  Thank you, your Honor.

16           MR. HIRSCHMANN:  Alternatively, might Mr. Golshani

17   briefly state the facts?

18           THE COURT:  That would be fine, too.  That will

19   expedite.

20           Let's have Mr. Golshani tell us what his role has

21   been in this matter and Mr. Abascal can modify or supplement

22   the record to the extent that he needs to.

23           Do you want to go forward, Mr. Golshani?

24           THE DEFENDANT: Yes.

25           Basically myself and three other people bought

1   stock in a company called NEIP.  That is the symbol NEIP Web

2   World and we posted false messages on the message boards on

3   Yahoo, Finance, Raging Bull and Free Real Time and from those

4   messages the stock price jumped.  And as it jumped, me and

5   the three other gentlemen sold our stock for a profit.

6            THE COURT:  In essence, you used these messages on

7   these bulletin boards to manipulate the stock price?

8            THE DEFENDANT: Correct.

9            THE COURT:  And I take it these were positive

10   messages?

11            THE DEFENDANT:  Yes.

12            THE COURT:  All right.  So the positive messages,

13   then, created or generated interest on the part of others who

14   might want to purchase; is that correct?

15            THE DEFENDANT:  That is correct.

16            THE COURT:  And by virtue of creating that positive

17   interest, you were able to sell your stock at a price that

18   was beyond what it was worth?

19            THE DEFENDANT:  That is correct.

20            THE COURT:  All right.

21            And you retained profits for yourself, you and the

22   others?

23            THE DEFENDANT:  Correct.

24            THE COURT:  Did this start on or about December

25   15th, 1999?

1   THE DEFENDANT:  I believe it was November 15th.

2   THE COURT:  Of 1999?

3   THE DEFENDANT:  Correct.

4   THE COURT:  And where did this take place?

5   Was it here in the Los Angeles area?

6   THE DEFENDANT:  Yes.

7   THE COURT:  All right.  And Mr. Melamad and others

8   were involved in this?

9   THE DEFENDANT:  That is correct.

10  THE COURT:  I take it before you posted these

11  messages you had some conversations with Mr. Melamed and

12  others regarding what you were going to do and the reason for

13  doing it?

14  THE DEFENDANT:  Yes.

15  THE COURT:  And what --  were those conversations

16  such that each of you were discussing a means by which you

17  could actually inflate and manipulate the price of the

18  stock?

19  THE DEFENDANT:  It wasn't very extensive.

20  It was --

21  THE COURT:  It doesn't matter how extensive it

22  was.

23  THE DEFENDANT:  It was very general like just post

24  messages, what kind of messages, well, this type of message.

25  That is basically the talk.

1    THE COURT:  All right.  But with the understanding

2  that the objective for posting those kind of messages was to

3  increase interest in the stock and inflate its price?

4    THE DEFENDANT:  That is correct.

5    THE COURT:  All right.

6    All right.  Mr. Abascal, do you want to supplement

7  the record at all at this point?

8    MR. ABASCAL: I think it's been made clear, but I

9  just ask that Mr. Golshani state whether or not he knew the

10  messages were false at the time.

11    THE COURT:  Okay, good.

12    Mr. Golshani?

13    THE DEFENDANT:  Yes, I did.

14    THE COURT:  Okay.

15    Anything further?

16    MR. ABASCAL:  No, your Honor.  Thank you.

17    THE COURT: Thank you, Mr. Abascal.

18    All right.

19    Is there anything else that the defense would like

20  to add with respect to the factual basis issue here?

21    MS. DIEM:  No.

22    THE COURT:  All right.  And I take it the

23  Government has nothing further to add at this time?

24    MR. ABASCAL:  Not to the factual basis, your honor.

25    THE COURT:  All right.

1          All right.  Then to defense counsel, do you concur

2   in the plea and waivers and stipulate that there is a factual

3   basis for the plea?

4          MS. DIEM: Yes, your honor.

5          THE COURT:  All right.

6          I find the following:

7          First of all, that the plea and waivers --

8          MR. ABASCAL:  Your Honor, I think this has been

9   covered.  I may have missed it.

10          I want Mr. Golshani to understand that we have, the

11  Government and the defense, have stipulated to certain

12  sentencing factors but the Court is under no obligation to

13  accept those and the Court may depart from the agreement of

14  the parties.  I think that has been covered.

15          THE COURT:  Yeah, I think it --  I know it was.

16          MR. ABASCAL:  Okay.  Thank you.

17          THE COURT:  But just so everybody is comfortable,

18  you understand, Mr. Golshani, I think we talked about this

19  before, but let me say it one more time.

20          You understand that this agreement may be binding

21  between the Government and you.  It's not binding on me?

22          THE DEFENDANT:  Correct.

23          THE COURT:  And so I can look at the

24  recommendations and take those into account but in the end

25  the Court is free to impose any sentence that it believes is

1   appropriate within the law, within the statutes that you have

2   pled guilty to?

3          Do you understand that?

4          THE DEFENDANT:   I do.

5          THE COURT:   Including departing either upward or

6   downward from the guidelines.

7          Do you understand that?

8          THE DEFENDANT:   I do.

9          THE COURT:   Thank you. All right.

10         Anything further, Mr. Abascal?

11         MR. ABASCAL:   No.   Thank you very much.

12         THE COURT:   Plea and waivers:   The Court finds that

13  the plea and waivers are made knowingly, voluntarily and

14  intelligently and free of any coercive influence of any

15  kind.

16         I find that the defendant understands the nature

17  and potential consequences of pleading guilty.

18         I find that there is a factual basis for the plea.

19         It is therefore ordered that the plea of guilty to

20  counts 1 and 2 of the indictment be accepted and entered on

21  the record of this court.

22         The matter is to be referred to the probation

23  office for pretrial investigation and report and continued

24  for sentencing.

25         The report shall be disclosed to the defendant at

1   least 35 days prior to sentencing unless this minimum period

2   is waived.

3           All right.  How does June 5 look for counsel?

4           MR. ABASCAL:  Your Honor, since this is a

5   cooperation agreement and we envision more investigation, we

6   would ask for a sentencing date further out, maybe three or

7   four months further out.

8           THE COURT:  All right.

9           Give me just --

10          MR. ABASCAL:  September.

11          THE COURT:  Is that acceptable?

12          MS. DIEM:  Yes.

13          THE COURT:  All right.

14          How about September 11.

15          MR. ABASCAL:  That's fine, your Honor.

16          MS. DIEM:  That's fine, your honor.

17          THE COURT:  September 11, year 2000, 1:30 p.m. in

18  this courtroom.

19          Defendant is ordered to return on that date at that

20  time.

21          I will also order the defendant to report forthwith

22  to the United States Probation Office to commence cooperating

23  with the probation officer assigned to the presentence

24  investigation of the case.

25          Is there anything further, counsel?

1          MS. DIEM:  No.

2          MR. ABASCAL:  No, your Honor.

3          THE COURT:  All right.  Then we will be in recess.

4          Can I see both counsel briefly at the side before I

5     go back to chambers?

6               (Proceedings at sidebar not reported.)

7               (End of proceedings.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4        I hereby certify that the foregoing matter is

5   transcribed from the stenographic notes taken by me and is a

6   true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15
    _____        _____
    DAVID A. SALYER, CSR, RMR               DATED: March 21, 2000
16  Official Court Reporter
    License No. 4410
17

18

19

20

21

22

23

24

25

# DECLARATION OF ALBERT BOOTESAZ

I, Albert Bootehsaz, am the uncle of Arash Aziz-Golshani and have over the years taken the place of his father. Arash's mother is my sister and I am very close to both of them.

I gave financial and moral support to Arash when he was charged with these crimes ten years ago. I was also actively involved in meetings with his attorney, Mr. Hirschmann and I specifically recall some of the conversations as it relates to the consequences of a conviction.

At no time did Mr. Hirschmann tell my nephew in my presence that he was going to be facing serious immigration consequences if he pleaded guilty to these charges. He was clearly told that my nephew was not a U.S. citizen and only had a green card.

I am very certain that if my nephew knew that he would become what is now learned to be "an aggravated felon" he would not have entered a plea of guilty. If that was to be the case I myself would have encouraged him to go to trial or ask his lawyer to continue negotiations with the prosecution.

All I recall Mr. Hirschmann saying when it came to immigration consequences was that it was not going to be a big problem that cannot be "fixed later." We took him at his word since he represented that he spoke with someone knowledgeable in immigration law. However, he never referred us to such an individual and never told us it was necessary to get such advice on our own.

I swear under penalty of perjury that the above statement is true and correct.

Date: 8.31.10

A. Bootesaz

Albert Bootesaz

LAW OFFICES OF

# SHAHROKH MOKHTARZADEH

A PROFESSIONAL LAW CORPORATION

TEL: (310) 286-1200
FAX: (310) 286-1250

815 MORAGA DRIVE
LOS ANGELES, CALIFORNIA 90049
Email: SHAHROKH@SMPLCLA.COM

TEL: (310) 472-7800
FAX: (310) 472-9977

May 17, 2011

To Whom It May Concern:

I, Shahrokh Mokhtarzadeh, am an attorney licensed to practice law in the state of California. I have been practicing law in California since 1988. I have assisted and represented Arash Aziz-Golshani in various State civil proceedings.

Prior to Arash's plea of guilty to a charge in U.S. v. Golshani, CR 00-07 GAF, I spoke at length with his attorney, Ralph Hirschmann, about Arash Aziz-Golshani's possible immigration concerns to make sure there would be no complications. I was assured in a telephone conversation with Hirschmann that he had spoken to an immigration attorney and there will be no issue.  To the best of my recollection, Mr. Hirschmann stated that if there is an immigration problem it could be resolved after he gets out of prison and completes probation.  I also recall that in course of my telephone conversation Mr. Hirschmann advised it was more important now to get this case settled then to worry about Arash's immigration status. He was very confident that any situation could be resolved easily after he is released.  I never heard and to the best of my recollection, Mr. Hirschmann never once indicated that this offense was an "aggravated felony" and that it could or would lead to deportation.

This was the general thinking and tone about the case, as I recall, and to the best of my recollection, this issue was  not once contradicted by Mr. Hirschmann. Arash voiced on several meetings with myself that Hirschman had advised him on his immigration status and he would still be able to become a U.S. Citizen after his probation was completed. This was consistent with the content of my telephone conversation with Mr. Hirschmann.

Since then, I have learned that Mr. Hirschmann was not aware of the long term implications of Arash's immigration status, resulting from this particular criminal conviction. If Mr. Hirschmann had properly advised him and informed him or I of such consequence, I am certain that such a concern would have changed our and Arash's entire strategy in dealing with this case and my advice to his family.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed in Los Angeles, California, on May 17, 2011

Shahrokh Mokhtarzadeh